**William F. DALTON, individually and as representative of a Bondholder Class, Plaintiffs,**

v.

**ALSTON & BIRD et al., Defendants.**

**Civ. No. 85–4302.**

United States District Court, S.D. Illinois, Benton Division.

June 12, 1990.

On Motion to Reconsider June 21, 1990.

Gary P. Bunch, Carrollton, Ga., G. Keith Phoenix, Kenneth W. Bean, Shepherd, Sandberg & Phoenix, Robert Ritter, Paul C. Hetterman, Gray & Ritter, St. Louis, Mo., John C. Stotsenburg, New York City, for plaintiffs.

Mary Bonacorsi, Thompson and Mitchell, Barry Short, Daniel Claggett, Michael Vitale, Lewis and Rice, St. Louis, Mo., Rich-

ard Boyle, Gundlach, Lee, Belleville, Ill., Paul D. Giamanco, Giamanco and Wexstten, Mt. Vernon, Ill., Rebecca Jackson, David Slavkin, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., Joseph R. Davidson, Bernard and Davidson, Granite City, Ill., Charles Dufour, Becker, Dufour & Yarbrough, Mark G. Arnold, St. Louis, Mo., James Spiotto, Rick Bailey, Chapman & Cutler, Chicago, Ill., William Cobb, H. Marshall Korschun, Atlanta, Ga., Harry B. Wilson, Jr., St. Louis, Mo., Richard O. Hart, Hart & Hart, Benton, Ill., Wendy A. Grossman, Chapman & Cutler, Chicago, Ill., Herbert Schlanger, Atlanta, Ga., James C. Cook, Belleville, Ill., Peter J. Anderson, Kirk McAlpin, Atlanta, Ga., for defendants.

## MEMORANDUM AND ORDER

FOREMAN, Chief Judge:

This case arises from the default of First Mortgage Medical Facility Revenue Bonds ("bonds" or "bond issue") issued by the Jefferson County Health Facilities Authority, Inc. ("the Authority"). As this action is ready to proceed to trial, the defendants, in various combinations, have filed twenty-nine motions for summary judgment or dismissal. The motions raise some issues raised earlier in the litigation, which the Court addressed in *Goldwater v. Alston & Bird (Goldwater I)*, 664 F.Supp. 403 (S.D. Ill.1986) and *Goldwater v. Alston & Bird (Goldwater II)*, 116 F.R.D. 342 (S.D.Ill. 1987)[1]. The Court now has the opportunity to address some questions left open in both *Goldwater* decisions, as well as other issues raised for the first time.

### I.

This case begins with the financial difficulties of a 50–bed hospital known as the Jefferson Memorial Hospital Association ("Jefferson Hospital") in Mount Vernon, Illinois. The operation of the hospital in the early 1970's had been a financial disaster. By 1975, the occupancy rate had de-

clined to 50 per cent, and by 1978 the occupancy rate had fallen to 34 per cent. The Hospital was in a state of disrepair and could not purchase modern equipment. Jefferson Hospital could not compete with neighboring hospitals, and filed for bankruptcy. Its certification was revoked by the Illinois Department of Health and as of November, 1979, the hospital was closed.

Prior to filing for bankruptcy, Jefferson Hospital had obtained a permit from the Illinois Department of Health to relocate to two nearby nursing homes, Hickory Grove Manor and View Manor. Jefferson Hospital had planned to convert these facilities into a combined acute care hospital and nursing home. In 1977, Jefferson Hospital contracted with UDE Corporation to secure financing to convert the Hickory Grove facility and with UDE, Inc., a wholly owned subsidiary of UDE Corporation[2], to be general contractor for the project. UDE Corporation is controlled by Art Lewis and Glen Lewis (the Lewises).

UDE Corporation could not obtain sufficient financing for the conversion. It could only obtain short term bank loans at a high interest rate. That caused the conversion of the hospital portion of the facility to halt while the nursing care section was unable to meet state standards for acute care patients. As a result, the hospital lost its licensing as a skilled nursing facility and lost its Medicare certification by the Department of Health, Education and Welfare.

On November 2, 1979, the Lewises, through an entity called the Grove Partnership, purchased the Hickory Grove facility. Another partnership controlled by the Lewises, the View partnership, acquired an adjacent property known as the Hickory View Manor Nursing Home. The complaint alleges that in order to salvage the financing and construction deal entered into by the UDE companies, the Lewises, with the aid of their attorneys Gallop, Johnson, Crebs &

---

1. Hymen P. Goldwater, the original class representative in this action, died in 1989. His name has been deleted from the caption due to the intervention of plaintiff William F. Dalton, but his estate remains a class member.

2. UDE Corporation and UDE, Inc., have both filed for bankruptcy and are not defendants in this lawsuit.

Neuman (Gallop, Johnson)[3], formed the Jefferson County Health Facilities Authority, Inc., to issue bonds to finance the purchase of the Hickory Grove and Hickory View Manor nursing homes. The underwriter for this bond issue was Hereth, Orr and Jones (HOJ). At the same time, the Lewises also formed Mt. Vernon Hospital, Inc. (Mt. Vernon Hospital), as a not-for-profit corporation to lease and operate the facilities. Mt. Vernon Hospital subsequently retained Hospital Management Associates (HMA)[4] to act as management consultants for the new hospital.

St. Louis Union Trust Co.[5] (Boatmen's Trust) acted as the indenture trustee for this bond issue. According to the terms of the indenture, Boatmen's was to make payments to UDE, Inc., upon the receipt of certain documentation from the Mt. Vernon Hospital. At the time of the indenture, Boatmen's Trust's sister bank, Boatmen's Bank, had made loans to UDE Corporation.

Price Waterhouse & Co. (Price Waterhouse) prepared the financial statements used in the offering statements. The financial statements assumed a patient occupancy rate of 80%. The financial forecast also included a projection of revenues for the hospital. The projection was based on a rate of $123.00 per inpatient day. The projection also assumed that the new facility would receive prompt Medicare certification. Peter Wright (Wright) of the law firm of Jones, Bird & Howell (Jones, Bird)[6], acted as counsel for the bond issue. Among the expert statements made by Jones, Bird was the representation that the bonds were tax-exempt under Internal Revenue Code Section 103, 26 U.S.C. § 103. The bonds were eventually granted tax-exempt status under Internal Revenue Code Section 501(c)(3), 26 U.S.C. § 501(c)(3).

After the bonds were issued and sold in 1980, the venture ran into difficulties. Despite representations in the offering statement that the new hospital would receive timely Medicare certification, certification was denied[7]. Furthermore, there were delays in completing the construction of the hospital. Because of these and other difficulties, the hospital could not operate at the predicted occupancy rate. Consequently, the bond issue went into default in February, 1982.

This complaint is brought on behalf of the purchasers of the bond issue.[8] The complaint states six causes of action: 1) a claim predicated on Rule 10b–5 and the Illinois Securities Act; 2) a claim under the RICO statute; 3) negligence against Alston & Bird and Jones, Bird, and against Price Waterhouse; 4) breach of contract against Alston & Bird and Jones, Bird; 5) breach of fiduciary duty against Boatmen's Trust; 6) a claim under Section 12(2) of the 1933 Securities Act.

## II.

A Court may grant summary judgment only if the party seeking summary judgment demonstrates that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(e); *Wilson v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 841 F.2d 1347, 1354 (7th Cir.1988), petition for cert. dismissed in 487 U.S. 1244, 109 S.Ct. 1, 101 L.Ed.2d 953 (1989). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with evidence to show what facts are in actual dispute. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106

---

**3.** Now known as Gallop, Johnson & Neuman. Gallop, Johnson has entered into a settlement agreement with the plaintiff class.

**4.** HMA has entered into a settlement agreement with the plaintiff class.

**5.** Now called Boatmen's Trust Company, and also known at one point as Centerre Trust Company.

**6.** Jones, Bird later merged with Alston, Gaines & Miller to create Alston & Bird.

**7.** Counsel for Price Waterhouse indicated that the denial of Medicare certification was reversed by an administrative law judge. Hearing Transcript p. 20.

**8.** Throughout this memorandum the term "plaintiff" is meant to apply to all members of the plaintiff class.

S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Donald v. Polk County*, 836 F.2d 376, 379 (7th Cir.1988). Where the moving party fails to meet its strict burden of proof, summary judgment cannot be entered even if the opposing party fails to respond to the motion. *Yorger v. Pittsburgh Corning Corp.*, 733 F.2d 1215, 1222 (7th Cir.1984).

When the parties do not dispute the factual basis of a motion for summary judgment, the court's only inquiry is whether judgment should issue as a matter of law. The burden of proof on this matter rests with the moving party. Summary judgment is inappropriate, however, if the parties disagree about inferences reasonably to be drawn from undisputed facts. *Bowyer v. United States Dept. of Air Force*, 804 F.2d 428, 430 (7th Cir.1986), cert. denied — U.S. —, 110 S.Ct. 846, 107 L.Ed.2d 840 (1990).

When the parties dispute the facts, the parties must produce proper documentary evidence to support their contentions. The parties cannot rest on mere allegations in the pleadings, *Boruski v. United States*, 803 F.2d 1421, 1428 (7th Cir.1986), or upon conclusory allegations in affidavits. *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985). The Court must view the evidence and any permissible inferences from the materials before it in favor of the non-moving party, *Matsushita Elecs. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986), as long as the inferences are reasonable. *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir.1988). The non-moving party must show that the disputed fact is material; that is, it must be outcome-determinative under the applicable law. *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n*, 806 F.2d 146, 149 (7th Cir.1986).

### III.

In order to prevail in a private cause of action under Section 10 of the 1934 Securities Exchange Act, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5, a plaintiff must show that the defendant used a facility of interstate commerce to do any of the following in connection with the purchase or sale of a security: 1) employ any device, scheme, or artifice to defraud; 2) make any untrue statement or material omission; or 3) engage in any act which would operate as a fraud. Id. In implying a private right of action under this rule, courts have imposed the additional requirements of scienter, reliance, causation and materiality. *See* Loss, *Fundamentals of Securities Regulation* 1125 (1983).

■ The element of reliance has been expanded by courts in recent times. In *Basic, Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (Rehnquist, C.J., and Scalia and Kennedy, JJ., not participating), the Supreme Court allowed a plaintiff to draw a presumption of reliance based on the integrity of the market. The Court reasoned that, in an effective market in actively traded securities, the market price reflects all relevant information. Therefore, even a plaintiff who did not rely on the specific acts or omissions of the defendant could rely on the market price of the security purchased to reflect those acts or omissions since they operate as a fraud on the market.

■ Although fraud on the market has its *Basic* application in a developed and active market, the Fifth Circuit in *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981) (en banc), cert. denied 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983), extended the rationale to an undeveloped (new issues) market. *Shores* stated that an investor in a new issue obviously cannot rely on the integrity of the market to determine a price for issue; therefore, in a new issue case, to show reliance the purchaser must show that the bonds were not entitled to be marketed at any price. *Id.* at 470.

In an earlier opinion, this Court adopted the *Shores* rationale. *Goldwater I*, 664 F.Supp. at 409–411. The Court cautioned, however, that it remained to be seen whether the plaintiff could show that the bond issue could not have been marketed at any price. *Id.* at 411. The defendants have now challenged the ability of the plaintiffs to show the unmarketability of

the bond issue. This requires the Court to first determine as a matter of law what is meant by the standard "not entitled to be marketed"[9]; next, the Court must determine whether there is a material issue of fact as to whether the bond issue was unmarketable measured against this standard.

The standard for determining whether a security is not entitled to be marketed at any price must be defined in terms of the *Shores* rationale. In *Shores,* the court held that, although an investor in a new issue cannot rely on the integrity of the market to determine the price of a security, an investor may rely on the market for protection from certain other risks. *Shores,* 647 F.2d at 470–471.

An example of such a risk is found in *T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority,* 717 F.2d 1330 (10th Cir.1983), cert. denied 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687. The court there held that the bonds were not entitled to be marketed because they were not validly issued under substantive state law. *Id.* at 1333. In other words, if the bonds were not authorized to be issued under substantive state law, they would clearly be unmarketable. This Court has previously rejected the contention that the *T.J. Raney* test was the exclusive test for determining whether a bond issue was unmarketable at any price. *Goldwater I,* 664 F.Supp. at 411. However, *T.J. Raney* shows one example of a fraud which would make securities not entitled to be marketed at any price.

■ An investor in a new issue may also rely on the integrity of the market as to

the terms of the security. If a bond is offered as a thirty year bond bearing an interest rate of 12.25%, an investor can rely on the bond being a 12.25% thirty year bond. This, of course, does not mean that an investor can rely on receiving 12.25% over the course of thirty years, or that an investor can rely on receiving a full return on the principal. Those items relate to the risk inherent in the bond issue. It merely means that a purchaser of a new issue may rely on the face terms of the bond to be the same as the terms at which the bond is marketed.

■ This Court has also previously recognized that the question of the tax exemption of the bonds is relevant in determining whether a fraud on the market existed in this case. *Goldwater II,* 116 F.R.D. at 350. The tax status of these bonds is the subject of a different motion discussed below. For purposes of the fraud on the market theory, it suffices to say that the bonds were eventually ruled tax-exempt under Internal Revenue Code § 501(c)(3), 26 U.S.C. § 501(c)(3). An investor in the tax-free bond market can rely on the tax-exempt status of the bonds, but cannot rely on the specific Internal Revenue Code section under which the bonds became tax-exempt.[10]

■ Last, investors may rely on the intent of the promoters to carry out the project for which the issue is sold. *Abell v. Potomac Insurance Co.,* 858 F.2d 1104, 1122 (5th Cir.1988), cert. denied —— U.S. ——, 109 S.Ct. 3242, 106 L.Ed.2d 589. An investor who purchases the bond need not make independent investigation that a

---

9. This Court's opinion in *Goldwater I* has been criticized for not offering a standard for determining whether the bonds were entitled to be marketed. Note, *Dredging the Shores Doctrine: Trends in The Fraud–On–The–Market Theory in the New Issues Context,* 23 Ga.L.Rev. 731, 758 (1989). The Court was not presented with the question of the standard for securities not entitled to be marketed in *Goldwater I,* and therefore did not decide it in that opinion. The question of a standard is more appropriately before the Court at this stage of the proceedings.

10. Even if this Court were to hold that the bonds were not entitled to be marketed at any

price because they were not tax-exempt at the time they were sold, the plaintiff would still not prevail under rule 10b–5 since he could not show loss causation. If the bonds were exempt under Internal Revenue Code § 103, as the offering statement suggests, the project would still have gone into default. See *LHLC Corp. v. Cluett, Peabody & Co.,* 842 F.2d 928 (7th Cir. 1988), cert. denied 488 U.S. 926, 109 S.Ct. 311, 102 L.Ed.2d 329 (1989) (plaintiff must show both loss causation and transaction causation; loss causation means the investor would not have suffered a loss if the facts were as he believed them to be).

project actually exists or into the intent of the promoters to invest in a project.

■ All courts which have addressed this issue have also added an element of scienter to this analysis. *Abell*, 858 F.2d 1104, 1122; *Ross v. Bank South, N.A.*, 885 F.2d 723, 729 (11th Cir.1989) (en banc); *Stinson v. Van Valley Development Corp.*, 719 F.Supp. 362, 366 (E.D.Pa.1989) aff'd 897 F.2d 524 (3d Cir.1990) (adopting the rule in *Abell*). This Court agrees that the investor in a new issue can only rely on the integrity of the market to protect him or her from frauds which the promoter intends or dangers which the promoter recklessly disregards. The new issues market does not protect the investor from the incompetence or negligence of the promoter.

■ The Court rejects the "no chance of success" test urged by the plaintiffs in this litigation. An investor who has not read the offering statements cannot rely on the integrity of the market to weed out the high risk ventures. Indeed, new issues are inherently risky and any investor who enters the market without obtaining adequate information about the risks involved in the venture cannot rely on the integrity of the market for protection.

Moreover, the "no chance of success" test is unworkable in practice. Arguably, every venture has some chance of success under the most improbable set of circumstances, and thus has some value. Cf. *Ross*, 885 F.2d at 736 (Tjoflat, J., concurring) ("no matter how great the risk of nonpayment, a bond can virtually always be sold at some combination of price and interest rate"). By adopting the "no chance of success" formulation, the courts would then, necessarily, draw an even finer line of determining what the appropriate chance of success is.[11]

■ In short, a new issue is marketable at some price if it is what it claims to be: a validly issued security, the terms of which are the same as the terms at which it is offered, the proceeds of which are intended to be used to finance some project. To successfully allege and prove a claim for relief under this theory, the purchaser of a security must show that the promoter of the venture was aware of or recklessly disregarded the infirmity in the security. Beyond this, investors in a new venture issue cannot rely on the integrity of an undeveloped market to protect them from risk.

■ The bonds issued by the Authority were entitled to be marketed. The plaintiff catalogues the fraudulent activities involved in the bond issue into five groups: 1) the Lewises' inexperience in hospital management and self-dealing; 2) the trustee's conflict of interest and breach of trust; 3) HMA's lack of ability to manage the hospital; 4) the misleading financial statements prepared by Price Waterhouse; 5) the opinion of bond counsel that the bonds were tax-exempt under Internal Revenue Code § 103. These defects in the bond issue are not sufficient, either individually or together, to make the bonds "not entitled to be marketed".

Taking all of the evidence in the light most favorable to the plaintiff, the Court can conclude only that the bonds were a bad investment. The plaintiff alleges that the Lewises had no prior construction experience on a job the size of the Mt. Vernon Hospital. The plaintiff also argues that HMA, as a new and highly leveraged company, was not in a position to adequately manage the hospital. There is nothing inherently wrong with novices attempting to run a business venture. A cautious investor would probably wish to avoid investing in such a project, but that does not make securities in the venture unmarketable.

The plaintiff also points to many instances of self-dealing. The instances stem mostly from UDE, Inc.'s, role as the construction contractor for the hospital. Plaintiff alleges that the amounts paid to UDE, Inc., and other contractual terms were the result of self-dealing rather than

---

**11.** Moreover, the Mount Vernon Hospital did have a legitimate chance of success, as seen by the success of the Hospital operating currently.

arm's length negotiations. Furthermore, plaintiff alleges that Boatmen's had a conflict of interest because its sister bank made loans to the Lewises. An investor who does not read the offering statements has no reason to believe that the project in which he or she is investing is free from self-dealing, since securities in projects ·involving self-dealing are not unlawful if the self-dealing is disclosed. *See Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 473–474, 97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977) ("Thus the claim of fraud and fiduciary breach in this complaint states a cause of action under any part of Rule 10b–5 only if the conduct alleged can fairly viewed as 'manipulative or deceptive' within the meaning of the statute.").

Similarly, the misstatements of the professionals involved in the bond offering are not enough to make the bonds "not entitled to be marketed." Had Price, Waterhouse utilized the forecast techniques suggested by the plaintiff, the interest rate on the bonds may have been different. Many cautious investors may have avoided the bond issue altogether. The bonds, though, would still have been entitled to be marketed at some combination of price and interest rate.

The misstatement of bond counsel regarding the tax-exempt status of the bonds poses a more serious question. A bond which is taxable is not entitled to be marketed on a tax-exempt market[12]. However, these bonds were tax-exempt. It is irrelevant that bond counsel was mistaken in determining the bonds were tax-exempt under one section of the Internal Revenue Code rather than another. Industrial Development Bonds, which are tax-exempt under Internal Revenue Code § 103, are just as entitled to be marketed on a tax-exempt market as bonds exempt under Internal Revenue Code § 501(c)(3).

Last, there is no evidence that the Lewises did not intend to invest the proceeds of the bond issue in the Mt. Vernon Hospital.

In *Abell,* the court observed that "[a]ll of the careful analysis of securities pundits and expert calculations of experienced investors cannot replace the irrefutable knowledge gained from a single source: the actual track record of the securities." 858 F.2d at 1122. Likewise, all the conjecture regarding the intent of the Lewises to carry out the hospital project cannot replace the knowledge gained from reviewing the actual disposition of the proceeds of the bond issue.

The bond proceeds were invested in the hospital project. The hospital was built, although after the construction deadline, and was operating. Affidavit of David Knell, ·Feb. 22, 1990. More significantly, the Lewises loaned additional money to the hospital, expecting to be repaid from the hospital's profits. Deposition of Glen Lewis, Nov. 14, 1989, at pp. 822–824. Given these facts, the Court finds there is no genuine issue of fact as to the intent to carry out the project.

Under the standard adopted by the Court, summary judgment on the Section 10 and Rule 10b–5 claims must be ·granted in favor of the defendants. There is no dispute that the bonds were ·validly issued under substantive state law. There is no dispute that the bonds were issued and offered at 12.25%. The plaintiff has stipulated that the bonds were eventually declared tax-exempt. The facts overwhelmingly show an intent by the promoters to use the proceeds of the bond issue to invest in the Mount Vernon Hospital.

The Court therefore GRANTS defendants' Motion for Summary Judgment on the Section 10. and Rule 10b–5 claims.[13]

### IV.

■ Under Section 12(2) of the 1933 Securities Act, any person who sells or offers to sell a security by a prospectus which contains a false statement or material omission is liable to the purchaser of

---

**12.** The Court emphasizes that the defendant, in marketing the bonds as tax-exempt, must have acted with scienter.

**13.** Dalton testified at his deposition that he neither received nor read the offering statement. Dalton deposition at pp. 40–41. Thus, plaintiff cannot prove traditional rule 10b–5 reliance.

that security. 15 U.S.C. § 77 *l*. All the defendants, except HOJ (the underwriter), have moved for summary judgment on the grounds that they did not sell or offer to sell the bond issue.

The Supreme Court recently clarified the liability of persons who sell or offer to sell securities under the 1933 Securities Act. In *Pinter v. Dahl*, the Court held that Section 12(1) of the Act imposes liability on those who pass title to a security and on a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." 486 U.S. 622, 647, 108 S.Ct. 2063, 2079, 100 L.Ed.2d 658 (1988). The Court rejected the "substantial factor" test, voicing its concern that "the test also would extend § 12(1) liability to participants only remotely related to the relevant aspects of the sales transaction. Indeed, it might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services, to § 12(1) strict liability for rescission. The buyer does not, in any meaningful sense, 'purchas[e] the security from' such a person." *Id.*, 108 S.Ct. at 2081.

The Court reached its conclusion in *Pinter* based on a statutory interpretation of § 12(1). Section 12(1) imposes strict liability on any person who offers or sells a security in violation of Section 5 of the Act (imposing a registration requirement for the sale of securities). The Court noted that the Act defines the terms "sell" and "offer to sell" in Section 2(3). The Court also interpreted the term "purchase", which is not defined in the Act. Based on its construction of these two terms, the Court reached its conclusion as to who can be liable under Section 12(1). In a footnote, the Court wrote

> The question whether anyone beyond the transferor of title, or immediate vendor, may be deemed a seller for purposes of § 12 has been litigated in actions under both § 12(1) and § 12(2). Decisions under § 12(2) addressing the "seller" question are thus relevant to the issue presented to us in this case, and, to that extent, we discuss them here. Neverthe-

less, this case does not present, nor do we take a position on, the scope of a statutory seller for purposes of § 12(2).

*Id.* at 2076, n. 20.

Although the Supreme Court has not squarely addressed the question of who can be liable as a seller under § 12(2), there is no reason to doubt the Court would adopt the reasoning of *Pinter* when faced with the question. The terms "sell" and "offer to sell" appear in § 12(2), and they should be defined in light of § 2(3). The term "purchase" appears in the body of § 12, and applies equally to § 12(1) and § 12(2). As a matter of statutory construction, the definitions in *Pinter* should govern liability under § 12(2). Furthermore, plaintiff has presented no reason, compelling or otherwise, why the reasoning of *Pinter* should not apply to § 12(2) liability. Three circuit courts which have addressed this question have decided that *Pinter* applies to claims under § 12(2), *Moore v. Kayport Package Express* 885 F.2d 531 (9th Cir.1989); *Wilson v. Saintine Exploration and Drilling Corp.*, 872 F.2d 1124 (2d Cir. 1989); *In re Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628 (3d Cir. 1989), as well as a district court in the Northern District of Indiana, *Ackerman v. Schwartz*, 733 F.Supp. 1231 (N.D.Ind.1989).

Under the definition of statutory seller in *Pinter*, the only defendants that can be held liable in this case are HOJ, its principals, the Lewises, the Lewis-controlled entities, and their officers and directors. Only these defendants arguably solicited the sale of the bonds motivated at least in part by a desire to serve their own financial interests. HOJ does not argue that it is not a statutory seller; similarly, HOJ's principals can be said to have solicited the sale motivated by a desire to serve their own financial interests. The Lewises, as well as the companies they controlled, also solicited sales of the bonds. The officers and directors of the Lewis-controlled entities may also have solicited the sale of the bonds motivated by a desire to serve the their financial interests.

The plaintiff also contends that the other defendants may be held liable under an aiding and abetting theory of liability. The Seventh Circuit has addressed the question of aiding and abetting liability under § 12(2), and has written:

> Because this circuit has not previously recognized aiding and abetting liability in the 12(2) context, plaintiffs request that the court declare a new implied private right of action under this theory. But notions of aiding and abetting liability would be inconsistent with the intent and language of the statutory provision which expressly limits to offerors and sellers the categories of persons who may be sued. Accordingly, many courts have refused to circumvent the section 12(2) seller requirement by implying some sort of secondary liability. [Citations omitted]. If aiding and abetting claims were cognizable, it would, in effect, eviscerate the various "substantial factor", "proximate cause" and "privity" tests adopted by the circuit courts for imposing liability. [Citation omitted]. Even the Second Circuit, which has expressly acknowledged section 12(2) aiding and abetting liability, limits it to defendants who act with scienter. [Citation omitted.] Therefore, in the absence of a showing that the Bank acted with scienter, we see no reason at this time to imply a right of action for aiding and abetting under section 12(2).

*Schlifke v. Seafirst Corp.*, 866 F.2d 935, 942 (7th Cir.1989).

Plaintiff contends that the last sentence of the above-quoted language from *Schlifke* indicates that the question of aiding and abetting liability is open in the Seventh Circuit. While the question of aiding and abetting liability may technically be open in this circuit, the Court of Appeals seriously questions the wisdom of implying aiding and abetting liability. The plaintiff has not addressed these concerns. This Court believes that implying civil liability for aiding and abetting would seriously undermine the Congressional intent in limiting Section 12 liability to sellers. Significantly, the Second Circuit has rejected aiding and abetting liability for violations of Section 12 in light of *Pinter*. *Wilson*, 872 F.2d at 1127. Therefore, this Court will not imply aiding and abetting liability under Section 12. *Accord Ambling v. Blackstone Cattle Co.*, 658 F.Supp. 1459, 1467–68 (N.D.Ill.1987).

The plaintiff also seeks to hold the non-selling defendants liable on a conspiracy theory. Secondary liability for securities violations has been imposed based on a conspiracy under other parts of the securities laws, but in light of the Congressional intent to limit liability under Section 12 to statutory sellers, this Court will not allow the plaintiff to hold non-selling defendants liable under a conspiracy theory.

The Court thus GRANTS defendants' Motion in part, and DENIES it in part.

The defendants also seek summary judgment on the Section 12 claims as time-barred. The statute of limitations for claims under Section 12 is one year after the discovery of the untruthful statements, or after such discovery should have been made by the exercise of reasonable diligence, but in no event more than three years after the sale of the security. 15 U.S.C. § 77m. In *Goldwater I*, this Court held that the plaintiff had alleged sufficient facts to invoke the equitable tolling doctrine of fraudulent concealment. *Goldwater I*, 664 F.Supp. at 407. This Court found that the statute of limitations began to run in May, 1984.

The defendants argue that Dalton's deposition testimony indicates that he was aware of the fraud alleged in the complaint as early as February, 1982, when the bonds defaulted. This contention is based on the following testimony:

Q. What was your understanding of [the notice of default] after you read it?

. . . . .

A. If I may be candid?
Q. Yes.
A. I just got screwed.
Q. Okay. Why did you think you just got screwed?

A. Because the bond had stopped payment or the people who owned their—borrowed the money had stopped payment, had not made their payments.

Q. Okay. And did you feel that you had been defrauded in some fashion when you received that?

A. Yes.

Deposition of William Dalton, January 13 and 14, 1987, pp. 106–107.

Dalton continued to testify that he then called the indenture trustee (Boatmen's) to ask what the status of the bond issue was. He was told that the trustee was trying to recover some or all of the money for the bondholders. Deposition of William Dalton, January 13 and 14, 1987, pp. 107–110.

The testimony on which the defendants rely does not indicate that Dalton knew of the untruthful statements in February, 1982, when he got the notice of default. It is entirely natural for a bondholder who receives a notice of default to feel cheated and defrauded. This Court is unwilling to equate a general feeling of being cheated with knowledge of fraud. Furthermore, Dalton's actions after he received the notice of default, i.e. calling the trustee in an attempt to get further information, and Boatmen's assurances that it was trying to get some or all of the bondholder's money back, indicate that Dalton did not know of the fraud in February, 1982.

The plaintiffs, however, face a more serious difficulty with their Section 12(2) claim. Congress has imposed an absolute bar of three years from the date of sale in which to bring an action under the 1933 Securities Act. 15 U.S.C. § 77m. This Court has previously held that the statute of limitations was tolled until May, 1984. *Goldwater I*, 664 F.Supp. at 407. At that time the plaintiffs did not plead an action under Section 12(2). For the purposes of determining limitations under Section 12(2), fraudulent concealment does not toll the absolute bar of three years. *Summer v. Land & Leisure, Inc.*, 664 F.2d 965, 968

(5th Cir.1981), *cert. denied* 458 U.S. 1106, 102 S.Ct. 3485, 73 L.Ed.2d 1367; *Admiralty Fund v. Hugh Johnson & Co.*, 677 F.2d 1301, 1308 (9th Cir.1982); *Gutfreund v. Christoph*, 658 F.Supp. 1378, 1389 (N.D.Ill. 1987). Therefore, the Court GRANTS defendants' motion, and the Section 12(2) claims are DISMISSED.

## V.

█ Plaintiff also seeks to hold the defendants liable under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 et seq. ("RICO"). The defendants maintain that summary judgment should be issued in their favor because the plaintiffs have failed to establish the "pattern of racketeering activity" which is required by 18 U.S.C. § 1962(c).

The Supreme Court recently addressed the pattern of racketeering requirement in *H.J. Inc. v. Northwestern Bell Telephone Co.*, —— U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). In *H.J. Inc.*, the Court indicated that a pattern of racketeering activity is established when there is proof that: (1) the predicate acts are related, and (2) the acts were committed over a long period of time or threaten to extend into the future. *Id.* at ——, 109 S.Ct. at 2902. Furthermore, the Court indicated that "predicate acts extending over a few weeks or months and threatening no future criminal conduct" do not satisfy the second requirement. Here, all of the alleged predicate acts occurred over the course of a few months in 1980.

In addition, all of the alleged predicate acts are based on mail and wire fraud allegations and revolve around a single bond issue [14]. The Seventh Circuit has consistently held that mail and wire fraud are unique among the various forms of racketeering activity. *Triad Associates, Inc. v. Chicago Housing Authority*, 892 F.2d 583, 595 (7th Cir.1989); *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278–79 (7th Cir. 1989); *Lipin Enterprises Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir.1986) (Cudahy J.,

---

14. The complaint alleges that the predicate acts also included offenses involving fraud in the sale of securities. The Court has already held, in part III of this opinion, that the defendants did not commit any fraud in the sale of securities. Therefore, the only predicate acts remaining as the basis of a RICO claim are mail fraud and wire fraud. *See Ross*, 885 F.2d at 732.

concurring). They are unique because "a multiplicity of predicate acts ... may be no indication of the requisite continuity of the underlying fraudulent activity." *Triad Associates, Inc.,* 892 F.2d at 595. This idea is especially true in the current context, where a bond issuance is the underlying transaction. This is the type of complicated transaction which "requires many separate statements from a variety of persons: financial statements from the accountants, opinions from the lawyers, oral statements from the parties negotiating the sale, and so forth." *Morgan v. Bank of Waukegan,* 804 F.2d 970, 976 (7th Cir.1986). The Seventh Circuit recognizes that the "mere fact that the complexity of the transaction generates numerous pieces of paper and hence a greater number of fraudulent acts does not make these predicate acts ongoing over a period of time so as to constitute separate transactions that are distinct in time and place." *Id.*

In this case, the bonds were marketed from June, 1980, to August, 1980. Peter Wright Deposition pp. 190–191. Jones, Bird was retained as bond counsel and HOJ was retained as underwriter in May, 1980. Deposition of J. Neil Huber Vol. II, p. 19. Thus, the defendants could have engaged in racketeering activity in connection with the bond sale for a period of only three months.

In *H.J., Inc.,* the Supreme Court stated that continuity is both a closed- and open-ended concept. *H.J., Inc.,* —— U.S. at ——, 109 S.Ct. at 2902. The predicate acts involved in the bond issue constitute a closed-ended set of predicate acts. "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time." *Id.* Three months, in terms of a $9,375,000 bond issue, is not a substantial period of time. Therefore, the defendants cannot show the continuity required for a closed-ended set of predicate acts.

In *H.J., Inc.,* the Court also listed several examples of threats of continuing racketeering activity which would satisfy the continuity aspect of the pattern require-

ment. *H.J., Inc.,* —— U.S. at ——, 109 S.Ct. at 2902. One example of such a threat is a hoodlum who sells "insurance" to a storekeeper to prevent vandalism, and collects the premiums monthly. Since this sort of criminal activity almost by definition continues indefinitely, it threatens to continue in the future. Another way of establishing continuity is by showing that the predicate acts are the entity's regular way of doing business.

The plaintiff cannot show that the racketeering activity related to the bond issue threatened to continue for any additional period of time. There is no evidence or argument that any other securities would be issued for the hospital project. There is no evidence or argument that the Hospital or any of the other defendants regularly conducted their business through a series of predicate acts. The bond issue was, at most, an isolated instance of a legitimate business engaging in racketeering activity. This Court does not believe that an isolated transaction in an otherwise legitimate business is sufficient to establish a pattern of racketeering activity under *H.J., Inc.*

In addition, an 18 U.S.C. § 1962(c) violation requires that the enterprise and the person liable be separate entities. *Haroco, Inc. v. American National Bank & Trust,* 747 F.2d 384 (7th Cir.1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). During the May 3, 1990 hearing, plaintiffs' counsel indicated that Mt. Vernon Hospital, Inc. was the enterprise. *See* Transcript of May 3, 1990 Hearing at 114–117. Plaintiff has, however, named Mt. Vernon Hospital, Inc. as a defendant and is thus seeking to have the Mt. Vernon Hospital deemed a person liable to plaintiff. Accordingly, even if the plaintiff could establish a pattern of racketeering activity, his 1962(c) claim would fail because the alleged enterprise is also alleged to be a person liable to plaintiff. Thus, the Court GRANTS The Defendants' Joint Motion for Partial Summary Judgment on the RICO claims.

## VI.

The complaint also states a claim for negligence against Price Waterhouse and

bond counsel defendants. Price Waterhouse has moved for summary judgment on the negligence claim. Price Waterhouse contends that it owed no duty to the plaintiff class. Price Waterhouse contends that, under Illinois law, a third party may recover damages from an accountant if the accountant's work was used to influence the plaintiff's business decision. Since the plaintiff did not rely on Price Waterhouse's financial statements, and did not even know that Price Waterhouse prepared any part of the offering statement, Price Waterhouse contends that its work was not used to influence the plaintiff's business decision.

■■■ Price Waterhouse misstates Illinois law regarding an accountant's liability to third parties for negligence. A third party may recover from an accountant for negligence if the third party can prove facts that show that the purpose and intent of the accountant-client relationship was to benefit or influence the third-party plaintiff. *Brumley v. Touche Ross & Co.*, 139 Ill.App.3d 831, 834, 93 Ill.Dec. 816, 819, 487 N.E.2d 641, 644 (1985); *see also Zanders v. Jones*, 680 F.Supp. 1236, 1239–41 (N.D.Ill. 1988), aff'd. 872 F.2d 424 (7th Cir.1989) (third party may bring negligence claim against attorney if the primary or direct purpose of the attorney-client relationship was to benefit the third party; finding no such purpose). Price Waterhouse was employed to prepare financial forecasts which were to be used in the offering statements. Thus, the intent of the relationship between the Authority and Price Waterhouse was to influence investors to purchase the bonds. The plaintiff is within the category of persons to whom Price Waterhouse owed a duty in connection with their financial forecast, even if the forecasts were not actually used to influence his business decision.

Price Waterhouse's motion raises the question whether the plaintiff will be able to show that Price Waterhouse's negligence proximately caused his injuries. Dalton has testified that he never read the financial forecasts and that he did not even know that Price Waterhouse had prepared them. Therefore, it is difficult to see how any negligence on the part of Price Waterhouse could have been the proximate cause of the plaintiff's loss. However, Price Waterhouse concentrated, in its motion, on arguing that it owed no duty to Dalton. Since the plaintiff was not squarely presented with a proximate cause argument, he could not respond to that argument. The plaintiff may have a legitimate theory of proximate causation. It would be improper to grant summary judgment without allowing him an opportunity to expound this theory.[15]

■■■ The complaint also states a claim of negligence against bond counsel defendants. These defendants include Peter Wright (the attorney who prepared the offering statement), Jones, Bird & Howell (his law firm) and Alston & Bird. Alston & Bird is the partnership which resulted from the merger of Jones, Bird & Howell with Alston, Miller & Gaines, and which continues the business of Jones, Bird. The plaintiff seeks to hold Alston & Bird liable for the negligence of Jones, Bird based on a successor partnership theory.

Alston & Bird has moved for summary judgment on the ground that it cannot be held liable for the actions of Jones, Bird unless it expressly assumed liability for those acts. In support of its motion, Alston & Bird attached the affidavits of former partners of Jones, Bird and Alston, Miller & Gaines. These partners state that Alston & Bird did not agree to assume the debts of Jones, Bird. The plaintiff does not offer any facts or argument to contradict these statements[16]. Instead, plaintiff ar-

---

**15.** The Court notes that it has already addressed this issue. *Goldwater v. Alston & Bird,* No. 85–4302 slip op. at 2–7 (S.D.Ill. July 31, 1987) (unpublished) (Document 297 in court file). The Court distinguished between duty and liability, and held that Price Waterhouse owed a duty to the plaintiff and the class he represents.

The Court further stated that it felt the elements of breach of duty and causation in a negligence action are best left to a jury. *Id.* at 6.

**16.** Nor does the plaintiff present any evidence or argument to refute Alston & Bird's contention that the Jones, Bird partners were admitted

gues that Alston & Bird should be liable to Jones, Bird's creditors as a result of Alston & Bird's continuation of the business of Jones, Bird.

In support of its position, Alston & Bird cites *Wierzbinski v. Celina Mutual Insurance Co.*, 426 F.Supp. 27 (E.D.Wis.1976). Applying Wisconsin law [17], the court in *Wierzbinski* held that a successor partnership could not be liable for the torts of its predecessor. Id. at 28. The Court agrees with the reasoning of *Wierzbinski* as to the liability of a successor partnership for the torts of its predecessor, and therefore GRANTS Alston & Bird's Motion as to those claims grounded in tort.

The court in *Wierzbinski* also states that "it is arguable that contract claims could be enforced against a successor partnership when the business of the company is continued without liquidation," *Id.* The court based this distinction on the widespread adoption of the entity concept of partnership for contractual liability. This Court views the distinction as reasonable, and adopts it. Therefore, the Motion is DENIED as to the plaintiff's contract claims [18].

## VII.

■ The complaint also states a claim against Boatmen's Trust for breach of contract and breach of fiduciary duty. Boatmen's Trust acted as an indenture trustee for the bond issue. The plaintiff contends that Boatmen's had an inherent conflict of interest as trustee since its sister bank, Boatmen's Bank, had lent money to the Lewises and therefore Boatmen's had an interest in seeing that the money was repaid. The plaintiff also contends that Boatmen's made payments from the trust in violation of the terms of the trust and wrongfully waived a claim for liquidated damages from UDE, Inc. (the contractor).

Boatmen's has moved for partial summary judgment on the issue of improper payments. It asks this Court to determine and establish for purposes of trial that the first payment it made to the general contractors (UDE Corp.) was made according to the terms of the trust. Even if this Court were to grant this motion, the claims against Boatmen's would not be resolved. The plaintiff also claims that there was an inherent conflict of interest, and that Boatmen's breached its duties as indenture trustee by allowing misrepresentations to be made by the principals.

Although Rule 56(d) of the Federal Rules of Civil Procedure authorizes a court, upon a denial of a motion for summary judgment, to "ascertain what material facts exist without substantial controversy", it does not authorize an independent motion to establish certain facts as true. *Arado v. General Fire Extinguisher Corp.*, 626 F.Supp. 506, 509 (N.D.Ill.1985); Wright & Miller, *Federal Practice and Procedure: Civil 2d* § 2737 (1989 Supp.). The provisions of Rule 56(d) are designed to salvage whatever constructive results have come from the judicial effort in deciding the motion. 6 Part 2 Moore *Moore's Federal Practice,* ¶ 56.20[3.3] at 56–1223 (2d ed. 1985). Those provisions do not authorize independent motions that would dispose of disputed factual issues in litigation piecemeal. Furthermore, allowing litigants to use Rule 56(d) to determine certain factual issues which do not dispose of an entire claim would require the court to pre-try all the factual issues in the case. This would contravene the purpose of summary judgment, namely judicial efficiency.

---

into the Alston, Miller & Gaines partnership, which then changed its name to Alston & Bird. After the admission of the Jones, Bird partners into Alston & Bird, the Jones, Bird partnership was dissolved.

**17.** The parties have not fully briefed the issue of which law should apply. The Court believes that Georgia law should determine the liability of a successor partnership where the two partnerships that merged and the successor are all located in Georgia. See Restatement (Second) of Conflicts § 295(1) (1971). Both Georgia and Wisconsin have adopted the Uniform Partnership Act, Ga.Code §§ 14–8–1 et seq.; Wis.Stat. §§ 178.01 et seq., and therefore *Wierzbinski* is relevant.

**18.** Alston & Bird did not file any motions directed towards the breach of contract claims. Indeed, these claims seem to have been forgotten by both parties.

Boatmen's Motion is, therefore, DENIED.

## VIII.

Bond counsel defendants have filed a motion for a determination that the statement in the offering statement that the bonds were tax-exempt is correct. Price Waterhouse has filed a motion for a determination that it was not negligent in failing to investigate whether Mt. Vernon Hospital could have gotten timely Medicare certification. For the reasons discussed above, these motions are inappropriate for summary judgment, and are therefore DENIED.

Price Waterhouse has moved for summary judgment on any claims against it based on a respondeat superior or agency theory of liability. It has also moved for summary judgment on the controlling person claims. A reading of the complaint indicates that none of the claims against Price Waterhouse are based on these theories. Since it appears that Price Waterhouse was neither a controlling person nor an agent or principal, these motions are GRANTED.

Boatmen's has separately moved for summary judgment on the securities law claims and on the RICO claim, based on its limited role as indenture trustee. Since the Court has already granted summary judgment on these claims, this Motion is DENIED as MOOT. But *see Lorenz v. CSX Corp.*, 736 F.Supp. 650 (W.D.Penn.1990) (available on WESTLAW) (holding that Rule 10b–5 does not impose any duty on an indenture trustee which is not in the indenture itself).

The defendants have also moved for summary judgment on the claims brought under the Illinois Securities Law of 1953. Ill.Rev.Stat. ch. 121½ ¶ 137.1 et seq. The Act provides for civil damages upon the tender of the securities. Ill.Rev.Stat. ch. 121½ ¶ 137.13(A). The plaintiff has not tendered his securities, and does not dispute that he cannot get rescissional damages under the Act. Since the Illinois Securities Law does not create an express private right of action for damages, *Peoria Union Stock Yards Co. v. Penn Mutual Life Insurance Co.*, 698 F.2d 320, 324 (7th Cir.1983), these claims are dismissed.

Defendant Allen Jones, a principal of HOJ, has filed a motion for summary judgment. Defendant Jack Hereth, another principal of HOJ, has also moved for summary judgment. These Motions are summarily DENIED.

## IX.

Based on the rulings above, the Court has determined that the following claims remain for trial: 1) negligence against Price Waterhouse; 2) negligence against the Jones, Bird defendants; 3) breach of contract against bond counsel defendants (Alston & Bird and Jones, Bird); 4) breach of fiduciary duty, breach of contract, and negligence against Boatmen's Trust[19].

IT IS SO ORDERED.

## ON MOTION TO RECONSIDER

Defendant Hereth, Orr and Jones, Inc. (HOJ) has orally moved this Court to reconsider its order of June 12, 1990, with respect to the statute of limitations for plaintiff's claims under Section 12(2) of the 1933 Securities Act. 15 U.S.C. § 77 *l*.

HOJ argues that the limitations period for Section 12(2) claims imposes an absolute bar of three years for commencing an action. 15 U.S.C. § 77m. Therefore, the doctrine of fraudulent concealment does not apply to the Section 12(2) claims in this case. The Court has reviewed the motion for summary judgment on this claim (Document 488). This motion was prepared by attorneys for defendant Gallop, Johnson. The last three paragraphs of the brief in support of the motion address the issue of an absolute bar of three years. The brief states that "[t]here is no case in this circuit which directly addresses the question of whether equitable tolling applies to Section 13." Brief at 8.

---

**19.** While this memorandum opinion was being prepared, the Court was informed that a settlement had been reached with Boatmen's and a partial settlement had been reached with the Lewises.

HOJ has cited two cases from the Northern District of Illinois which have directly addressed this issue. *Gutfreund v. Christoph,* 658 F.Supp. 1378, 1389 (N.D.Ill.1987); *Rosin v. ETX Petroleum Corp.,* No. 84 C 3579 slip op. at 2, 1985 WL 3502 (N.D.Ill. Oct. 19, 1985) (unpublished disposition available on Lexis). Furthermore, HOJ has presented this Court with numerous cases holding that the doctrine of equitable tolling does not apply to the three year limitation in Section 13.

The Court GRANTS the Motion for Reconsideration, and MODIFIES its June 12, 1990, order by GRANTING defendants' Motion (Document 488). All claims against defendants HOJ, Futra Industries, and Allen O. Jones based on Section 12(2) of the 1933 Securities Act are DISMISSED. The Court also MODIFIES its June 12 Memorandum and Order (Document 593) as follows:

1) The first full paragraph at page 22 of the memorandum is deleted. The following is substituted: *

  The plaintiffs, however, face a more serious difficulty with their Section 12(2) claim. Congress has imposed an absolute bar of three years from the date of sale in which to bring an action under the 1933 Securities Act. 15 U.S.C. § 77m. This Court has previously held that the statute of limitations was tolled until May, 1984. *Goldwater I,* 664 F.Supp. at 407. At that time the plaintiffs did not plead an action under Section 12(2). For the purposes of determining limitations under Section 12(2), fraudulent concealment does not toll the absolute bar of three years. *Summer v. Land & Leisure, Inc.,* 664 F.2d 965, 968 (5th Cir. 1981), *cert. denied* 458 U.S. 1106, 102 S.Ct. 3485, 73 L.Ed.2d 1367; *Admiralty Fund v. Hugh Johnson & Co.,* 677 F.2d 1301, 1308 (9th Cir.1982); *Gutfreund v. Christoph,* 658 F.Supp. 1378, 1389 (N.D. Ill.1987). Therefore, the Court GRANTS defendants' motion, and the Section 12(2) claims are DISMISSED.

* Editor's Note: These changes have been incorporated into the Order.

2) The last paragraph of page 33, except for footnote 19, is modified to read: **

Based on the rulings above, the Court has determined that the following claims remain for trial: 1) negligence against Price Waterhouse; 2) negligence against the Jones, Bird defendants; 3) breach of contract against bond counsel defendants (Alston & Bird and Jones, Bird); 4) breach of fiduciary duty, breach of contract, and negligence against Boatmen's Trust[19].

IT IS SO ORDERED.

** Editor's Note: These changes have been incorporated into the Order.