[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court are the Motion for Summary Judgment of Children's Friend and Service (Defendant)[1] and the Motion for Partial Summary Judgment of Joseph L. Rowey, Linda E. Rowey, Meghan E. Rowey, and Lisa A. Rowey (Plaintiffs).[2] Also before this Court is Defendant's Motion to Strike the Affidavits of Joseph L. Rowey and Linda E. Rowey.
 FACTS/TRAVEL
On or about September 11, 1981, Joseph L. Rowey (J. Rowey) and Linda E. Rowey (L. Rowey) (collectively, the Roweys), wishing to adopt a child, filled out an "Adoptive Home Application" (application) with Children's Friend and Service (CFS), an adoption agency. In their application, the Roweys noted, among other things, that they would not consider "a child who requires parents who can help him with the special needs he faces because of health, emotional problems or intellectual limitations." On April 30, 1982, CFS caseworker Camille Hardiman (Hardiman) wrote the Roweys, stating that CFS had approved their application and would contact them when a child became available. In December of that same year, Hardiman informed the Roweys that a child was available for adoption. This child, whom the Roweys later named Lisa A. Rowey (Lisa), was born on October 29, 1982.
CFS placed Lisa with the Roweys on December 7, 1982. Shortly thereafter, Dr. Monti, a pediatrician, assumed medical care of Lisa. During the placement period, Lisa proved difficult to comfort and exhibited behaviors such as banging her head and hands on the floor, holding her breath, and temper tantrums.
Throughout the adoption process, Hardiman met with and interviewed the Roweys on several occasions. Allegedly, Hardiman orally communicated to the Roweys certain information, including Lisa's natural mother's appearance and interests, that CFS did not know where Lisa's natural father was, that Lisa's natural mother had given birth to another baby who was probably two years old, and that Lisa was a full-term baby who had a normal and healthy birth. (Tr. of J. Rowey at 84-85, 90-91.) Prior to the adoption's finalization, the Roweys requested a written genetic history from CFS. (Tr. of L. Rowey at 71.) However, CFS did not provide the written genetic history to the Roweys prior to September 21, 1983, on which date the Roweys finalized Lisa's adoption.
On or about January 28, 1985, CFS sent the Roweys a document entitled "Genetic History, Lisa Ann Rowey" (Genetic History) which included two pieces of information previously unknown to the Roweys: (1) that Lisa's natural mother received no prenatal care or counseling and (2) that Lisa's natural father, at the time of agency contact, was incarcerated for breaking and entering. The Genetic History came unaccompanied by a cover letter or any form of explanation. Lisa, in the meantime, continued to suffer from temper tantrums and sometimes behaved violently towards family members.
The Roweys, concerned with Lisa's behaviors, began seeking additional advice. In 1990, they took Lisa to see Mary Mueller of Psychiatric Services, Inc., who noted that "better background information [on Lisa] would be possible." (Tr. of L. Rowey at 115.) In addition to Mary Mueller, Dr. Boulay, a psychologist, saw Lisa sometime in the late eighties or early nineties and likewise noted that the Roweys needed better information on Lisa. (Tr. of L. Rowey at 115.) The Roweys also sought the help of Dr. Savitsky, a psychiatrist, who in October of 1990 diagnosed Lisa with Attention Deficit Hyperactivity Disorder (ADHD) and Oppositional Defiant Disorder (ODD). Lisa was also diagnosed with Bipolar Disorder. Finally, in the early-to-mid nineties Lisa began seeing Dr. Hunt.
Prompted by a request from Dr. Hunt, J. Rowey asked CFS for additional information on Lisa's background in 1994. In response, CFS caseworker Tacy A. Hackey wrote the Roweys on February 15, 1995, revealing the following previously undisclosed information about Lisa's natural mother: (1) she engaged in occasional and very limited marijuana and alcohol use; (2) she did not realize that she was pregnant for the first three months of her pregnancy with Lisa and continued to take birth control pills; (3) she began taking diet pills when she started putting on weight on account of the pregnancy; (4) she smoked one to one-and-a-half packs of cigarettes per day during her pregnancy with Lisa; (5) she suffered from depression in the past, including during her first pregnancy and her pregnancy with Lisa; (6) she attempted suicide during her first pregnancy; (7) her brothers were known to "get into some trouble"; and (8) she frequently ran away from home. The letter further indicated that Lisa's birth father "probably uses drugs."
CFS submitted two documents to the Family Court, entitled "Summary" and "Adoption Report" and dated November 24, 1982 and September of 1983, respectively, containing information regarding Lisa's natural family that was not disclosed to the Roweys prior to the adoption and some of which was not made known to the Roweys until 1995. CFS also possessed two documents entitled "Assessement," one dated November 2, 1982 and the other dated January 6, 1983, both of which contained information concerning Lisa's natural family that was not disclosed to the Roweys prior to the adoption.
On January 12, 1998, Plaintiffs filed suit against Defendant. They assert the following causes of action: (1) negligent misrepresentation, (2) intentional misrepresentation, (3) negligent infliction of emotional distress, (4) intentional infliction of emotional distress, (5) negligence, (6) breach of fiduciary duty, and (7) breach of contract. Plaintiffs claim they have suffered great mental anguish, emotional distress, property damage, and bodily injury; that they have been forced to expend large sums of money for medical and psychiatric treatment; that they have lost opportunities for Lisa's proper medical and psychiatric treatment; and that Lisa was not properly diagnosed and/or treated for her psychological and developmental problems and lost opportunities for proper diagnosis, treatment and care.
 PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Plaintiffs move this Court to grant partial summary judgment as to the following issues: (1) Plaintiffs' claims have been timely filed because they were tolled until February of 1995; (2) Defendant had a duty to Plaintiffs; (3) Defendant breached its duty to Plaintiffs; (4) the Roweys may assert claims for Lisa's future care costs; and (5) Lisa is a proper plaintiff and, therefore, possesses standing in this case.[3]
Defendant, however, argues that Plaintiffs' Motion for Partial Summary Judgment is procedurally improper because Plaintiffs cannot utilize summary judgment to obtain rulings that various elements of their causes of action have been satisfied.
This Court finds that Plaintiffs' Motion for Partial Summary Judgment, with the exception of Plaintiffs' claims as to the statute of limitations and Lisa's standing, is procedurally improper. Superior Court Rule of Civil Procedure 56(c) provides that "[a] summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." That is, "when there is a genuine issue as to damages, but not as to the ultimate liability of the nonmoving party, an interlocutory summary judgment is appropriate." Wright, Miller Kane, Federal Practice and Procedure: Civil 3d § 2736. Since a genuine issue as to Defendant's liability exists, Rule 56(c) does not provide Plaintiffs with a procedural basis for their motion.
Furthermore, Superior Court Rule of Civil Procedure 56(d) states:
 "If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion . . . shall if practicable ascertain what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy. . . . Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly."
This rule "governs whenever it appears that the entire case cannot be disposed of on a motion for summary judgment and that a trial will be necessary." Norberg v. Warwick Liquors, Inc., 107 R.I. 129, 134,265 A.2d 648, 651 (R.I. 1970). Where such circumstances exist, "the trial court should, if practicable, ascertain what material facts are actually and in good faith controverted, and . . . should thereupon make an order establishing certain facts and leaving others for determination at the trial." Id.
As Superior Court Rule of Civil Procedure 56 is identical to the federal rule, this Court may look to cases interpreting the federal rule to explain the state rule. See Smith v. Johns-Manville Corp., 489 A.2d 336, 339 (R.I. 1985) (stating that "where the federal rule and our state rule of procedure are substantially similar, . . . [the court] will look to the federal courts for guidance or interpretation of our own rule"). A number of courts interpreting Federal Rule of Civil Procedure 56(d) have held that it "does not authorize the entry of a judgment on part of a claim or the granting of partial relief." Wright, Miller Kane,Federal Practice and Procedure: Civil 3d § 2737. Rather, "[t]he procedure prescribed in subdivision (d) is designed to be ancillary to a motion for summary judgment," and Rule 56(d)'s main purpose "is to salvage some results from the effort involved in the denial of a motion for summary judgment." Id. For instance, when a party moved for partial summary judgment as to several issues, including that a person possessed a duty not to disclose information, the court noted that Rule 56(d) "does not provide a mechanism whereby litigants can request such relief directly"; rather, "Rule 56(d)'s issue-narrowing provision operates only in the wake of an unsuccessful (and proper) motion under Rule 56(a) or 56(b)." SEC v. Thrasher, 152 F. Supp.2d 291, 295 (S.D.N.Y. 2001). Seealso Dalton v. Alston Bird, 741 F. Supp. 1322, 1337 (S.D. Ill. 1990) (noting that Rule 56(d)'s provisions "are designed to salvage whatever constructive results have come from the judicial effort in deciding the motion" and "do not authorize independent motions that would dispose of disputed factual issues in litigation piecemeal"); Saylor v.Fayette R. Plumb, Inc., 30 F.R.D. 176, 180 (E.D. Pa. 1962) (stating that Federal Rule of Civil Procedure 56 "does not contemplate partial summary judgment as to a portion of a single claim"); URI Cogeneration PartnersL.P. v. Bd. of Governors for Higher Educ., 915 F. Supp. 1267, 1279 (D.R.I. 1996) (stating that Federal Rule of Civil Procedure 56(d) "provides a procedural device whereby the Court may salvage much labor from a denial of summary judgment"). In applying this rule, one court reasoned that "allowing litigants to use Rule 56(d) to determine certain factual issues which do not dispose of an entire claim would require the court to pre-try all the factual issues in the case. This would contravene the purpose of summary judgment, namely judicial efficiency."Dalton, 741 F. Supp. at 1337. Therefore, this Court finds that Superior Court Rule of Civil Procedure 56(d) does not provide Plaintiffs with a procedural basis for their motion as to Defendant's duty, Defendant's breach, or Lisa's future care costs because these issues constitute only parts of claims.
In spite of this general rule against deciding parts of claims pursuant to a motion for summary judgment, some courts have held that Rule 56(d) may be used to eliminate affirmative defenses. See e.g., Sterling Bankv. Sterling Bank Trust, 928 F. Supp. 1014, No. CV-94-8378-KMW (MCx), 1996 U.S. Dist. LEXIS 12219, at *10 (D.C. Cal. May 13, 1996) (granting motion for partial summary judgment on affirmative defenses);Intl. Ship Repair Marine Servs. v. St. Paul Fire and MarineIns. Co., 944 F. Supp. 886, 891 (D.C. Fla. 1996) (stating that "partial summary judgment may be used by the Court to dispose of affirmative defenses. The effect being that if the moving party sustains its burden, then the affirmative defenses will be struck by the Court"). It has been stated that "[a]lthough a few courts have ruled that a partial summary judgment is not available because a Rule 12(f) motion to strike is the proper procedure, the better approach is to allow Rule 56(d) to be utilized" as "[a] motion to strike a defense under Rule 12(f) is extremely limited because no matter outside the pleadings can be considered in deciding the motion." Wright, Miller Kane, FederalPractice and Procedure: Civil 3d § 2736. Finding this reasoning persuasive, this Court will entertain Plaintiff's Motion for Partial Summary Judgment as to the statute of limitations and Lisa's standing because both constitute affirmative defenses.
 DEFENDANT'S MOTION TO STRIKE
Defendant moves to strike J. and L. Rowey's affidavits on the grounds that they contradict, without explanation, the Roweys' earlier deposition testimony. The Rhode Island Supreme Court has not squarely addressed whether, in ruling on a motion for summary judgment, a court may consider an affidavit that contradicts prior deposition testimony. The federal cases dealing with this issue reflect divergent views.[4] The First Circuit adheres to the view that "[w]hen an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed." Colantuoni v. Alfred Calcagni Sons, 44 F.3d 1, 4-5 (1st. Cir. 1994).
Although this Court finds the reasoning of the First Circuit persuasive, it denies Defendant's Motion to Strike as the Roweys' affidavits do not clearly contradict the Roweys' deposition testimony. In their affidavits, the Roweys swear that "[t]he information in the `Genetic History, Lisa Ann Rowey,' was relayed, verbally to Dr. E. James Monti, Mary Mueller, Guy Boulay, Jeffrey I. Hunt, M.D., Bradley Hospital, and Norther [sic] Rhode Island Mental Health, at the time of our visits with each health care provider." (L. Rowey Aff. ¶ 24; J. Rowey Aff. ¶ 23.) During her deposition, L. Rowey stated that she did not think that they brought the Genetic History to Dr. Monti; rather, they "put the letter aside and . . . just kept the information and chose what . . . [they] wanted out of it to tell people." (Tr. of L. Rowey at 154.) The Roweys' affidavit statement that the Genetic History was orallyconveyed to Lisa's health care providers does not clearly contradict L. Rowey's deposition testimony that she did not think they physicallybrought the letter containing the Genetic History to Dr. Monti.
The Roweys also swear in their affidavits that
 "[b]ut for the misrepresentations of Children's Friend and Service, relative to the medical and genetic background of the prospective adoptive child offered to us on December 7, 1982 and my reliance upon those misrepresentations, and said adoption agencies inducement to proceed, I would not have adopted said child or suffered any injuries." (L. Rowey Aff. ¶ 35; J. Rowey Aff. ¶ 34.)
At her deposition, L. Rowey testified that if she had come to know, at any time prior to September of 1983, that Lisa's natural mother had used marijuana some time prior to the pregnancy with Lisa, the Roweys would not have given Lisa back. (Tr. of L. Rowey at 68.) Linda Rowey further testified that if she had learned, at any time prior to September of 1983, that Lisa's natural mother had smoked during the pregnancy with Lisa, she probably would have proceeded with the adoption. (Tr. of L. Rowey at 68-69.) Joseph Rowey testified that he could not answer whether he would have proceeded with the adoption, after taking placement of Lisa, if he had discovered that Lisa's natural mother had received no prenatal care. (Tr. of J. Rowey at 62.)
Paragraph 35 of L. Rowey's Affidavit and paragraph 34 of J. Rowey's Affidavit do not clearly contradict the Roweys' deposition testimony. While L. Rowey's deposition testimony concerns how particular pieces of information, such as marijuana use or smoking, would affect the Roweys' decision to adopt, the Roweys' affidavits speak to the collective effect of Defendant's alleged misrepresentations. In her deposition, L. Rowey is not asked whether, given knowledge of all of Defendant's alleged misrepresentations, she would have adopted Lisa. Moreover, J. Rowey's deposition testimony does not contradict his affidavit as he fails to answer the question posed.
In their affidavits, the Roweys further swear that Mary Mueller and Guy Boulay did not "instruct us to try and obtain any additional information from Children's Friend and Service" or "indicate to us any suspicions that any of Lisa's biological family history may have been withheld." (L. Rowey Aff. ¶ 25 and 26; J. Rowey Aff. ¶ 24 and 25.) During her deposition, L. Rowey testified that Dr. Hunt was not "the first who had indicated we needed better information" and that the first people who evaluated Lisa, who included Mary Mueller, were the first to mention that better information was necessary. (Tr. of L. Rowey at 114.) Additionally, L. Rowey testified that Mary Mueller "just suggested that better background information would be possible" and that Guy Boulay's "feeling was that we needed better background information on her." (Tr. of L. Rowey at 115.) Joseph Rowey testified at his deposition that he did not know whether Dr. Boulay, Dr. Coleman, or anyone at Psychiatric Services, Inc. or Northern Rhode Island Mental Health had suggested that getting more information on Lisa's family background "would be a good idea" or stated that they would like to have more information. (Tr. of J. Rowey at 136-37.) This Court finds that L. Rowey's deposition testimony that Lisa's health care providers indicated that better information was possible or necessary does not clearly contradict the Roweys' sworn affidavit statements that they were not instructed to obtain additional information or that the health care providers did not communicate to them suspicions that information may have been withheld. Moreover, J. Rowey's deposition testimony does not contradict the Roweys' affidavits because he did not assume a position on the issue. As the Roweys' affidavits do not clearly contradict their deposition testimony, this Court denies Defendant's Motion to Strike on these grounds.
Defendant also argues that this Court should strike portions of the Roweys' affidavits because they contain statements that are inadmissible on the grounds of hearsay, lack of personal knowledge, speculation, and legal conclusion. Superior Court Rule of Civil Procedure 56(e) states that "[s]upporting and opposing affidavits [1] shall be made on personal knowledge, [2] shall set forth such facts as shall be admissible in evidence, and [3] shall show affirmatively that the affiant is competent to testify to the matters stated therein." Super. R. Civ. P. 56(e);Ludwig v. Kowal, 419 A.2d 297, 301 n. 5 (R.I. 1980). Consequently, a trial justice ruling on a summary judgment motion should not consider hearsay contained in affidavits. See Nichola v. Fiat Motor Co.,463 A.2d 511, 513-14 (R.I. 1983). Hearsay consists of "an out-of-court utterance that is being offered to prove the truth of the matter asserted therein." Worcester Textile Co. v. Morales, 468 A.2d 279, 281 (R.I. 1983). Additionally, an affidavit should not include conclusions of law.See DiCristofaro v. Beaudry, 110 R.I. 301, 303, 293 A.2d 324, 327 (1972) (agreeing with party's argument that "affidavits were not the place for legal conclusions"). See also William J. Kelly Co. v. ReconstructionFinance Corp., 172 F.2d 865, 867 (1st Cir. 1949) (disregarding as inappropriate conclusions of law contained in affidavit); Bongaards v.Millen, 768 N.E.2d 1107, 1110 (Mass. App. Ct. 2002) (stating that "[i]t is not the function of an affidavit to bring a legal argument before the trial court"). Where part of an affidavit fails "to conform to the prescribed limitations," the court does not have to expunge the entire affidavit; rather, the court "should disregard the incompetent portions and consider only that which has been properly included." Di Cristofaro,
110 R.I. at 303, 293 A.2d at 328-29.
Defendant moves this Court to strike paragraph 8 of the Roweys' affidavits on the grounds that it contains hearsay and is based on conclusory speculation rather than personal knowledge. In paragraph 8, the Roweys swear:
 "On many occasions between the Winter of 1980 through September 1983, we stated to Children's Friend and Service our requirements for the kind of child we were seeking to adopt. In conjunction with our specifications in the Adoptive Home Study and as previously testified to in this case, we indicated, directly to Children's Friend and Service employee, Camille Hardiman, that we wanted a child from a birth mother who had proper prenatal care, did not smoke, did not use alcohol or any controlled substances or any over the counter drugs and who took care of herself. Also, we told Camille Hardiman that we were seeking to adopt a `healthy, white infant.' It was my belief that Camille Hardiman knew and understood all of our requirements regarding the kind of child we would accept for adoption."
The Roweys' statements to Children's Friend and Service and Hardiman consist of out-of-court statements that are being offered to prove the truth of the matter asserted therein and, therefore, constitute hearsay. Accordingly, this Court grants Defendant's Motion to Strike as to the first three sentences in paragraph 8 of L. and J. Rowey's affidavits. This Court denies Defendant's motion as to the last sentence of paragraph 8, however, because it finds that the Roweys possess personal knowledge of what they believe another person believes, in light of the information they have communicated to that person.
Defendant further moves this Court to strike paragraph 14 of the Roweys' affidavits, arguing that it contains mere speculation and conclusory statements, rather than admissible facts within the personal knowledge of the declarant. In paragraph 14, L. and J. Rowey each swear:
 "Prior to accepting placement of the child presented to us for adoption, I believed that because we were so clear to Children's Friend and Service, both verbally and in writing, regarding our terms for a child, and that we provided such extensive documentation about ourselves that Children's Friend and Service had, in fact, used the information they possessed to match us with the most appropriate child that would complete our family."
This Court denies Defendant's Motion to Strike paragraph 14 of the Roweys' affidavits because Plaintiffs' beliefs as to the effect of the information they provided to CFS fall within their personal knowledge and do not consist of mere speculation and conclusory statements.
In addition, Defendant moves to strike paragraph 15 of the Roweys' affidavits, claiming that it contains conclusory statements, legal argument, and characterizations of written materials. In paragraph 15, the Roweys state:
 "Prior to offering us a child for adoption, Children's Friend and Service, had in its possession information that the prospective adoptive child's biological mother lacked prenatal care; her pregnancy with the child was deemed `high risk' and was an emergency `rapid delivery'; the biological mother took diet and birth control pills during her pregnancy; she experienced bleeding for the first five months of her pregnancy; she smoked 1-1½ packs of cigarettes a day during pregnancy; she used alcohol during the pregnancy, noting that `sometimes can be a lot'; she had a poor diet during pregnancy; had previous suicide attempt(s); was a high school drop out; had a history of running away from home, demonstrated anger and depression that was `substantial'; used marijuana; the child's biological father was in prison for `breaking and entering'; that in addition to the biological mother of the child, the biological grandmother may need some counseling of her own; that the biological grandmother also appeared `depressed'; negative information relative to Mary Roe's school history, siblings, maternal grandmother and paternal family. None of this information was ever disclosed to me or my . . . [spouse] prior to our adopting the child. We deem all of the above information material genetic, medical and family history that, had we known any time prior to the adoption of the child presented to us, we would not have adopted the child."
This Court grants Defendant's motion as to the first sentence of paragraph 15 because Plaintiffs' do not possess personal knowledge of what information Defendant possessed prior to the adoption. However, this Court declines to strike the second sentence of this paragraph as Plaintiffs do possess personal knowledge of what was or was not disclosed to them. Finally, this Court grants Defendant's motion as to the last sentence in paragraph 15 because it consists of legal argument. SeeMallette v. Children's Friend and Service, 661 A.2d 67, 71 (R.I. 1995) (establishing the legal standard that adoptive parents would not have adopted the child if they had known of the child's medical and genetic background).
Defendant also moves to strike paragraph 16 of the Roweys' affidavits on the grounds that it contains conclusory statements and legal argument. In paragraph 16, the Roweys state:
 "Due to Children's Friend and Service's failure to mention any of the above critical negative genetic, family, or medical history of the prospective adoptive child, and their affirmative statements that the prospective adoptive child was healthy and that her biological mother appeared to be doing well, I believed that Children's Friend and Service was presenting us a child that met all of our prior discussed specifications."
This Court denies Defendant's Motion to Strike as to paragraph 16, finding that Plaintiffs' beliefs as to what Defendant was going to do, in light of what CFS had and had not told Plaintiffs, consist of personal knowledge rather than conclusory statements and legal argument.
Finally, Defendant moves to strike paragraph 33 of L. Rowey's affidavit and paragraph 32 of J. Rowey's affidavit, arguing that said paragraphs contain hearsay, conclusory statements, legal argument, and characterizations of a written document. In paragraph 32, J. Rowey swears that:
 "All of the concerns about the issues that would be raised as a result of a mother who fails to seek proper prenatal care, were dispelled by the 1985 letter we received from Children's Friend and Service, labeled `Genetic History, Lisa Ann Rowey', because that document does not report any of the harmful consequences or negative information to support such concerns, as expressed by my wife."[5]
This Court grants Defendant's Motion to Strike as to paragraph 32 of J. Rowey's affidavit and paragraph 33 of L. Rowey's affidavit because they contain legal argument.
 DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT Standard of Review
"Summary judgment is a proceeding in which the proponent must demonstrate by affidavits, depositions, pleadings and other documentary matter" that the proponent "is entitled to judgment as a matter of law and that there are no genuine issues of material fact." Palmisciano v.Burrillville Racing Ass'n, 603 A.2d 317, 320 (R.I. 1992); Super. R. Civ. P. 56(c). When ruling on a summary judgment motion, the court "must consider the affidavits and other pleadings in a light most favorable to the party opposing the motion." Id. Moreover, in a summary judgment proceeding, "the court does not pass upon the weight or credibility of the evidence." Id. Rather, the trial justice's sole purpose is to ascertain whether any issues involving material facts exist. Steinberg v. State,427 A.2d 338, 340 (R.I. 1981). Thus, the judge "must look for factual issues, not determine them." Id.
"When an examination of the pleadings, affidavits, admissions, answers to interrogatories and other similar matters, viewed in the light most favorable to the party opposing the motion, reveals no such issue, the suit is ripe for summary judgment." Capital Props., Inc. v. RhodeIsland, 749 A.2d 1069, 1080 (R.I. 1999). In opposing a summary judgment motion, the parties "will not be allowed to rely upon mere allegations or denials in their pleadings." Bourg v. Bristol Boat Co., 705 A.2d 969, 971 (R.I. 1998). "Rather, by affidavits or otherwise they have an affirmative duty to set forth specific facts showing that there is a genuine issue of material fact." Id.; Super. R. Civ. P. 56(e). Nevertheless, it is not an absolute requirement that the nonmoving party file an affidavit in opposition to the motion. Steinberg, 427 A.2d at 340. If the affidavit of the moving party does not establish the absence of a material factual issue, the trial justice should deny the motion despite the nonmoving party's failure to file a counter-affidavit. Id.
 Analysis
I. Statute of Limitations
Plaintiffs and Defendant agree that R.I. Gen. Laws § 9-1-14(b), the three-year statute of limitations for personal injuries, applies to this case. As Plaintiffs filed this suit on January 12, 1998, and their cause of action accrued on September 21, 1983, the day of Lisa's adoption, Plaintiffs' claims are time barred unless some form of tolling applies.
Defendant moves this Court to grant summary judgment as to Plaintiffs' claims because Plaintiffs failed to file within the statutory period and, Defendant argues, equitable tolling, or the discovery rule, does not apply. Defendant further asserts that even if the discovery rule applies, a person exercising reasonable diligence in circumstances similar to Plaintiffs' would have been on notice of their claims when they received the Genetic History in 1985 or, at the latest, sometime between 1990 and 1993 when, Defendant argues, three health care professionals suggested to Plaintiffs that they obtain better background information on Lisa.
Plaintiffs, on the other hand, move this Court to grant Partial Summary Judgment that the limitations period has been equitably tolled until February of 1995; that Lisa and Meghan E. Rowey's (Meghan's) claims are tolled by R.I. Gen. Laws § 9-1-19, the minority tolling statute; and that Plaintiffs' claims are tolled on account of Defendant's fraudulent concealment under R.I. Gen. Laws § 9-1-20.
A. The Discovery Rule
In general, "a cause of action accrues and the applicable statute of limitations begins to run at the time of the injury to the aggrieved party." Martin v. Howard, 784 A.2d 291, 299 (R.I. 2001). However, pursuant to the discovery rule, the statute of limitations "will not begin to run until, in the exercise of reasonable diligence, the plaintiff should have discovered the injury or some injury-causing wrongful conduct." Id.
The discovery rule applies "[i]n some narrowly circumscribed factual situations . . . when the fact of the injury is unknown to the plaintiff when it occurs." Id. (internal quotations and citations omitted). Stated differently,
 "[t]he discovery rule applies if an element of a cause of action, such as damage has occurred, but cannot be pleaded in a proper complaint because it is not yet discoverable with reasonable diligence, or there is an inability of the injured party, despite the exercise of due diligence, to know of the injury or its cause." 51 Am. Jur.2d Limitation of Actions
§ 179.
Moreover, for the discovery rule to apply, the injury's nature must be inherently undiscoverable. Id. Whether or not the discovery rule applies to a certain factual situation presents a question of law. Rocchio v.Moretti, 694 A.2d 704, 706 (R.I. 1997); Benner v. J.H. Lynch Sons,Inc., 641 A.2d 332, 335 (R.I. 1994).
Courts have applied the discovery rule in a number of wrongful adoption cases. See e.g., April v. Associated Catholic Charities of New Orleans,629 So.2d 1295, 1298 (La. Ct. App. 1993) (applying discovery rule where adoptive parents adopted child who later developed fetal alcohol syndrome); Mohr v. Commonwealth, 653 N.E.2d 1104, 1109 (Mass. 1995) (applying discovery rule where social worker failed to disclose, and adoptive parents later discovered, that adopted child's mother was schizophrenic, that adopted child's infant development had been stunted, and that adopted child had been diagnosed with cerebral atrophy); Pricev. Washington, 980 P.2d 302, 308 (Wash. Ct. App. 1999) (applying discovery rule where Department of Social and Health Services failed to disclose certain information to adoptive parents, including that adopted child had been born to drug and possibly alcohol addicted mother, and child was diagnosed with a conduct disorder and suffered from fetal alcohol effects); Meracle v. Children's Service Society of Wis.,421 N.W.2d 856, 857 (Wis. Ct. App. 1988) (applying discovery rule where adopted child was diagnosed with Huntington's Disease after adoption agency assured adoptive parents that adopted child had no chance of developing the disease).
This Court finds that the discovery rule applies to Plaintiffs' cause of action because the fact of Plaintiffs' injury was unknown to Plaintiffs when it occurred. Plaintiffs' injury consists of their adoption of a child that did not meet, and was contrary to, the specifications they had communicated to Defendant; that is, the adoption of a child that, in fact, has special needs. Plaintiffs sustained their injury on the day of the adoption when the Roweys adopted Lisa. However, on this day, the Roweys did not know that Lisa did not meet their specifications or that she possesses special needs. Therefore, they did not know, on the day of the adoption, that they had sustained injury.
Defendant asserts that the discovery rule does not apply to this case because Plaintiffs adopted Lisa without first having obtained a written genetic history. In essence, Defendant argues that the nature of Plaintiffs' injury was not inherently undiscoverable because Plaintiffs could have obtained the written genetic history prior to the adoption through the exercise of reasonable diligence. The Rhode Island Supreme Court has articulated the reasonable diligence standard as follows:
 "The reasonable diligence standard is based upon the perception of a reasonable person placed in circumstances similar to the plaintiff's, and also upon an objective assessment of whether such a person should have discovered that the defendant's wrongful conduct had caused him or her to be injured. If a reasonable person in similar circumstances should have discovered that the wrongful conduct of the defendant caused her injuries as of some date before the plaintiff alleged that she made this discovery, then the earlier date will be used to start the running of the limitations period." Martin, 784 A.2d at 300.
This Court finds that Plaintiffs exercised reasonable diligence in trying to obtain Lisa's written genetic history. According to the Roweys, Defendant verbally provided the Roweys with a genetic history, the Roweys trusted that this verbal genetic history was complete, and the Roweys believed that the typewritten history would simply memorialize what they had been told orally (Tr. of L. Rowey at 71; L. Rowey Aff. ¶ 19 and 20; J. Rowey Aff. ¶ 18 and 19.) Furthermore, L. Rowey requested Lisa's written genetic history prior to the adoption's finalization (Tr. of L. Rowey at 71) and inquired about it again on the day of the adoption, when she still had not received it. (Tr. of L. Rowey at 145.)
This Court further finds that prior to the adoption, the nature of Plaintiffs' injury was inherently undiscoverable, regardless of whether Plaintiffs obtained the written genetic history. Even if Plaintiffs had obtained a written genetic history prior to the adoption, they could not, and should not, have discovered the nature of their injury as no injury yet existed. Plaintiffs' injury arose when they adopted Lisa and at no time prior.
B. Accrual of Plaintiffs' Causes of Action
Courts in wrongful adoption cases have applied different forms of the discovery rule. See e.g., Mohr, 653 N.E.2d at 1109 (applying rule that a cause of action accrues when "a plaintiff discovers, or any earlier date when she should reasonably have discovered, that she has been harmed or may have been harmed by the defendant's conduct"); Wolford v. Children'sHome Society of W. Va., 17 F. Supp.2d 577, 585 (S.D.W. Va. 1998) (stating that the statute of limitations does not begin to run until "the plaintiff knows, or by the exercise of reasonable diligence, should know (1) that plaintiff has been injured, (2) the identity of the entity who owed the plaintiff a duty to act with due care, and who may have engaged in conduct that breached that duty, and (3) that the conduct of that entity has a causal relation to the injury"); Price, 980 P.2d at 308 (noting that "a cause of action does not accrue until the plaintiff knows, or through the exercise of due diligence, should have known [its] . . . essential elements"); Nierengarten v. Lutheran Social Services,580 N.W.2d 320, 324-25 (Wis. 1998) (stating that "a cause of action will not accrue until the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was probably caused by the defendant's conduct"). The Rhode Island Supreme Court has yet to apply the discovery rule in the context of a wrongful adoption suit.
Furthermore, in several wrongful adoption cases, courts have held that the adoptive parents' cause of action accrued on the date that the adopted child was diagnosed with an illness or special need. InNierengarten, for example, the adoptive parents told the adoption agency they desired "a healthy child with no serious mental or physical handicaps." Id. at 322. Prior to the adoption, the agency provided the adoptive parents with information regarding the adoptive child, all of which was positive. Id. The child exhibited some behavioral problems during the placement period, but the agency assured the parents that these problems constituted "normal adjustment behavior which would subside." Id. The adoptive parents finalized the adoption, and the child was subsequently diagnosed with ADHD, and a few years after that, with Bipolar I and Mathematics Disorder. Id. The adoptive parents eventually requested additional information from the agency and discovered that prior to the adoption, information existed from which one could determine that the child had special needs. Id. at 323. The court held that the adoptive parents' cause of action accrued upon the date the child was diagnosed with ADHD because on that date the parents began incurring medical expenses, they could identify the agency as the alleged tortfeasor, and they could identify the alleged wrongful conduct in the form of the agency's statements and placement of the child. Id. at 325.See also April, 629 So.2d at 1298 (holding that cause of action for breach of duty of care accrued no later than the date on which adoptive mother spoke to doctor and doctor agreed with adoptive mother that child had fetal alcohol syndrome); Henning v. Tuscarawas County Dept. of HumanServices, C.A. NO. 94 AP 120095, 1996 Ohio App. LEXIS 733, at *9-11 (Ohio App. Ct. Jan. 8, 1996) (holding that adoptive parents' claims for negligence, wrongful adoption, and intentional infliction of emotional distress accrued on date that adopted child was diagnosed with cancer because on that date plaintiffs could have discovered that defendants' alleged negligence caused adopted child to have more advanced cancer, plaintiffs discovered that the agency's statements concerning the adopted child's health were inaccurate, and defendants' alleged acts and misrepresentations caused plaintiffs to suffer severe emotional distress); Meracle, 421 N.W.2d at 858 (holding that claim for medical expenses and damages for emotional distress associated with adopting a child who developed Huntington's Disease accrued upon diagnosis because then the nature of the injuries was known).
"Whether a statute of limitations has run against a plaintiff's claim is a question of law." Balletta v. McHale, 823 A.2d 292, 294 (R.I. 2003). However, "[w]here the evidence raises questions of fact under the statute of limitations, such questions should be submitted to the jury,"Bader v. Alpine Ski Shop, Inc., 505 A.2d 1162, 1166 (R.I. 1986), if "the determination of the initial factual question essentially answers the question of liability of the parties." Benner, 641 A.2d at 335. Seee.g., Bader, 505 A.2d at 1166 (court had to submit factual question of whether a contract was breached, and if so when, to the jury). It is appropriate for this Court to rule on when the statute of limitations accrued pursuant to the discovery rule because when Plaintiffs knew or should have known of their injury is not determinative of liability. SeeHenning, 1996 Ohio App. LEXIS 733, at *9-11 (upholding lower court's grant of summary judgment, finding that pursuant to the discovery rule, Plaintiffs' claims were time barred); Lombardi v. Sciacca, 707 A.2d 698, 699-700 (R.I. 1998) (upholding lower court's grant of summary judgment where motion depended on when claimant knew or should have known of his claim).
At the latest, Plaintiffs' claims accrued in October of 1990, when Dr. Savitsky diagnosed Lisa with ADHD and ODD. A review of the evidence reveals that at this point, the following had occurred: (1) Plaintiffs had requested a child who did not possess special needs because of health, emotional problems, or intellectual limitations; (2) J. Rowey testified that prenatal care "was probably the most important condition" of the adoption and "was not negotiable at all," and that the Roweys would not have taken placement of Lisa had they known about the lack of prenatal care (Tr. of J. Rowey at 60-61); (3) L. Rowey testified that a mother's lack of prenatal care would raise concerns in her mind about whether or not the child had developed normally, why the mother had not obtained prenatal care, how well the mother took care of herself, and whether the mother had something to hide (Tr. of L. Rowey at 65-66); (4) L. Rowey agreed that a lack of prenatal care would raise concerns in her mind as to whether the mother had used alcohol or drugs (Tr. of L. Rowey at 66); (5) the Roweys believed that CFS had used the information they required of the Roweys, along with the Roweys' stated specifications, to pair the Roweys with a child that met their requirements (L. Rowey Aff. ¶ 10; J. Rowey Aff. ¶ 10); (6) L. Rowey asked Hardiman "if the child she was presenting us was healthy and she assured . . . [L. Rowey] that was the case" (L. Rowey Aff. ¶ 17); (7) the Roweys believed, prior to the finalization of the adoption, that the written genetic history would memorialize the verbal genetic history that Hardiman had provided them (L. Rowey Aff. ¶ 20; J. Rowey Aff. ¶ 19); (8) as a child, Lisa proved difficult to comfort, engaged in agitated states and breath-holding episodes (Tr. of L. Rowey at 137), banged her head and hands on the floor (Tr. of J. Rowey at 101), and threw temper tantrums (Tr. of J. Rowey at 184); (9) at any early age, Lisa demonstrated violent behavior towards others, kicking and hitting her grandfather, hitting another child over the head with a chair, and kicking her mother so hard that J. Rowey considered taking L. Rowey to the emergency room (Tr. of J. Rowey at 185, 187-88); (10) in 1985, CFS sent the Roweys the Genetic History, revealing the previously undisclosed information that Lisa's mother had received no prenatal care and that Lisa's biological father was imprisoned at the time of agency contact; (11) L. Rowey, upon seeing the Genetic History, became concerned that CFS had not provided her with accurate information concerning prenatal care (Tr. of L. Rowey at 154-155); (12) Lisa's third grade teacher told the Roweys that Lisa was the worst kid she had ever seen (Tr. of J. Rowey at 161); (13) an individualized education plan was established for Lisa in the third grade (Tr. of L. Rowey at 166-167); and (14) in 1990, Lisa saw Mary Mueller for her behavioral problems, and Mary Mueller suggested to the Roweys that better background information on Lisa would be possible (Tr. of L. Rowey at 115).
Applying Rhode Island's formulation of the discovery rule, which mirrors the standard applied in Mohr, this Court finds that in October of 1990, Plaintiffs, in the exercise of reasonable diligence, should have discovered their injury or some injury-causing wrongful conduct. SeeMartin, 784 A.2d at 299 (stating the discovery rule). At this point in time, Plaintiffs knew or should have known that they had adopted a child that did not meet, and was contrary to, the specifications they had communicated to Defendant. In October of 1990, Plaintiffs knew that the child they had adopted suffered from at least two illnesses, ADHD and ODD, and that she required individualized treatment in school. Plaintiffs further knew that Defendant had withheld two pieces of information from them, Lisa's mother's lack of prenatal care and Lisa's father's imprisonment. In 1985, Plaintiffs not only discovered that the typewritten Genetic History did not merely memorialize the verbal genetic history that Defendant had provided them, but also that an important condition, prenatal care, had not been met. The Roweys also knew in 1990 that at least one health care provider thought better background information on Lisa was possible. Finally, the Roweys were aware of Lisa's behavioral problems as they witnessed manifestations of these problems since Lisa's early years.
Even by the standards set forth in Wolford and Nierengarten,
Plaintiffs' cause of action accrued in October of 1990. At this point in time, Plaintiffs could identity the entity who owed them a duty to act with due care and who may have engaged in conduct that breached that duty because they knew it was CFS that had placed this child with them, offered this child to them for adoption, failed to provide them with a child that met their specifications, and had withheld information from them. Plaintiffs further knew that CFS's conduct had a causal relation to their injury because had CFS obeyed their specifications, they would not have been placed with or adopted a child who in fact possessed special needs. Therefore, this Court grants Defendant's Motion for Summary Judgment as to J. Rowey's and L. Rowey's claims on the grounds that they are time barred.
C. Tolling for Concealed Cause of Action
Plaintiffs assert that their claims were tolled by R.I. Gen. Laws § 9-1-20, the statute for fraudulent concealment of a cause of action, until February of 1995. In support of this argument, Plaintiffs allege that Defendant submitted two documents to the Family Court that contained a family history while at the same time telling Plaintiffs that a typewritten history was unavailable. Defendant presented neither of these documents to the Roweys prior to Lisa's placement or adoption. Plaintiffs further assert that the Genetic History omitted significant negative family history and that Defendant revealed genetic and family history in Tacy A. Hackey's 1995 letter that is not detailed in the Genetic History. Finally, Plaintiffs allege that it was not until 1998 that CFS produced the Assessment, which contained even more genetic, medical, and family information.
The statute delineating the time of accrual of a concealed cause of action states:
 "If any person, liable to an action by another, shall fraudulently, by actual misrepresentation, conceal from him or her the existence of the cause of action, the cause of action shall be deemed to accrue against the person so liable at the time when the person entitled to sue thereon shall first discover its existence." R.I. Gen. Laws § 9-1-20.
Therefore, to prove fraudulent concealment of a cause of action, the plaintiff must show that (1) the defendant "made an actual misrepresentation of fact" and (2) "in making such misrepresentation, . . . [the defendant] fraudulently concealed the existence of . . . [the plaintiff's] causes of action." Kelly v. Marcantonio, 187 F.3d 192, 200 (1st Cir. 1999) (interpreting R.I. Gen. Laws § 9-1-20). Moreover, a party must prove reliance, and such reliance must be reasonable. See id.
at 201 (holding that plaintiffs' reliance on priest's representations that his sexual advances constituted part of plaintiffs' religious training was unreasonable as a matter of law and that, therefore, priest's statements did not constitute fraudulent concealment).
"Where there is no fraud shown, neither the ignorance of a person of his right to bring an action nor the mere silence of a person liable to the action prevents the running of the statute of limitations." Kenyonv. United Electric Rys. Co., 51 R.I. 90, 94, 151 A. 5, 8 (1930). Therefore, a personal injury plaintiff's claim was not tolled when she failed to file suit because she thought the defendant would settle and "[d]efendant's agents said nothing to persuade or induce her not to commence an action against the defendant." Id. at 96, 151 A. at 8.
Furthermore, R.I. Gen. Laws § 9-1-20 does not toll the statute of limitations for the concealment of another statutory remedy, in the form of an additional defendant, rather than a cause of action. Luft v.Factory Mutual Liability Ins. Co. of America, 53 R.I. 238, 165 A. 776, 777 (1933). At the same time, said statute will not toll the statute of limitations because "an additional theory of liability" was concealed.Kelly, 187 F.3d at 201. For example, the statute of limitations was not tolled on a claim asserted by alleged sexual abuse victims against a priest, diocesan officials, and churches on the theory that the officials and churches knew that the priests had committed sexual assaults before, failed to disclose this information, and concealed this information by transferring the priests to different parishes. Id. at 200. The court reasoned that the officials and churches never concealed "the fact of the injury itself." Id. at 201. Instead, "the essence of . . . [plaintiffs'] fraudulent concealment argument is that the . . . defendants' silence concealed from them an additional theory of liability for the alleged sexual abuse." Id.
This Court finds that Plaintiffs' claims are not tolled by R.I. Gen. Laws § 9-1-20. Plaintiffs allege that Defendant told Plaintiffs the typewritten history was unavailable. Plaintiffs' Memorandum of Law inSupport of Their Motion for Partial Summary Judgment and Their Objectionto Defendant's Motion for Summary Judgment at 43. Even if this Court were to accept Plaintiffs' allegation as true, and to consider it "an actual misrepresentation of fact," Plaintiffs fail to establish that in representing that the typewritten history was unavailable, Defendant fraudulently concealed the existence of Plaintiffs' cause of action. As in Kelly, Defendant never concealed "the fact of the injury itself" from Plaintiffs. Defendant did not conceal Lisa's behavioral problems, her learning difficulties, or her diagnoses. That Plaintiffs did not receive all the information that Defendant possessed concerning Lisa's family history constitutes, at best, an additional theory of liability, for which the statute will not be tolled.
Furthermore, were this Court to find that Defendant made an actual misrepresentation of fact and, in doing so, fraudulently concealed the existence of Plaintiffs' cause of action, Plaintiffs' cause of action accrued against Plaintiffs when Plaintiffs "first discover[ed] its existence." See R.I. Gen. Laws § 9-1-20. As discussed previously, this Court finds that Plaintiffs discovered the existence of their cause of action, at the latest, in October of 1990, when Lisa was diagnosed with ADHD and ODD. Therefore, even if R.I. Gen. Laws § 9-1-20
applies, Plaintiffs' suit is still untimely.
D. Tolling for Minority Status
Plaintiffs assert that Lisa and Meghan's claims were tolled under R.I. Gen. Laws § 9-1-19. Section 9-1-19 of the Rhode Island General Laws states that "[i]f any person at the time any such cause of action shall accrue to him or her shall be under the age of eighteen (18) years . . . the person may bring the cause of action, within the time limited under this chapter, after the impediment is removed." R.I. Gen. Laws §9-1-19. The older version of this statute, providing that minority status extends until twenty-one years of age, applies to causes of action that arose on or before July 1, 1988. See Roe v. Gelineau, 794 A.2d 476, 481-82 (R.I. 2002).
Since this cause of action arose on September 21, 1983, on the date of Lisa's adoption, Lisa's and Meghan's minority, for the purposes of the tolling statute, ends at twenty-one years of age. Whether this cause of action accrued in 1995, as Plaintiffs contend, or earlier, as Defendant argues, Lisa was a minor at the time as she just attained twenty-one years of age on October 29, 2003. Meghan was likewise a minor at the time this cause of action accrued as she is approximately seven years younger than Lisa. Thus, R.I. Gen. Laws § 9-1-19 applies to Lisa's and Meghan's claims. Lisa's claim is timely because she has already filed it, and pursuant to the statute, she has until October 29, 2006 to do so.[6] Similarly, Meghan's claim is timely as she is still a minor and has already filed suit. This Court, therefore, grants Plaintiffs' Motion for Partial Summary Judgment as to the application of the minority tolling statute to Lisa and Meghan's claims.
II. Standing
Defendant moves this Court to grant summary judgment as to all of Lisa's claims, arguing that Lisa does not possess standing in this suit because, inter alia, (1) the Roweys, and not Lisa, allegedly suffered emotional distress and bodily injury and incurred the past costs, property damage, and lost earnings; (2) CFS did not cause Lisa's genetic history or any conditions that arose allegedly as a result; (3) Lisa would incur costs for future care regardless of anything CFS did; and (4) only the Roweys, not Lisa, can claim to have relied on CFS's alleged representations. Alternatively, Plaintiffs move this Court to grant partial summary judgment that Lisa possesses standing to sue for her own wrongful adoption, and present a number of theories in support of this motion.
Standing constitutes "an access barrier that calls for the assessment of one's credentials to bring suit." Ahlburn v. Clark, 728 A.2d 449, 452 (R.I. 1999). A party possesses standing when it "alleges that the challenged action has caused . . . [it] injury in fact, economic or otherwise." Rosen v. Rosen, 818 A.2d 695, 697 (R.I. 2003) (internal quotations omitted). An injury in fact consists of "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." Id. Whether a person claiming standing possesses a legally protected interest constitutes a question of law. 59 Am. Jur.2d Parties § 34. In determining whether a party has suffered or will imminently suffer injury in fact, the distinction lies not between "substantial injury and an insubstantial injury," but "injury and no injury." Cummings v. Shorey,761 A.2d 680, 684 (R.I. 2000). The court has excused the standing requirement "[o]n rare occasions" to adjudicate a case of substantial public interest. Burns v. Sundlun, 617 A.2d 114, 115-16 (R.I. 1992) (excusing the standing requirement when the issue of simulcasting's propriety needed to be placed on a public referendum in the city because plaintiff had introduced "a question of statutory interpretation of great importance to citizens in localities that could become home to gambling facilities seeking to simulcast and invite wagering on out-of-state events").
In general, courts have held that psychological injuries are insufficient to confer standing on a party. See e.g., Graham v. Lappin,
No. TH 01-104-C-T/G, 2001 U.S. Dist. LEXIS 7840, at *8 (S.D. Ind. June 8, 2001) (stating that "[p]urely psychological harm suffered by a plaintiff is not sufficient to establish standing"); Ganulin v. UnitedStates, 71 F. Supp.2d 824, 830 (S.D. Ohio 1999) (noting that "psychological harm is not sufficient injury in fact to confer standing").
No court has expressly addressed the question of standing in the wrongful adoption context. In a number of wrongful adoption cases, the adopted child is named as a plaintiff in addition to the adoptive parents. See e.g., Mohr, 653 N.E.2d 1104 (adoptive mother brought case individually and as guardian of the person and estate of adopted child);Jackson v. Montana, 956 P.2d 35 (Mont. 1998) (adoptive parents filed suit individually and as parents and next friends of adopted child); Henning,
1996 Ohio App. LEXIS 733, at *1 (adoptive parents and child were named plaintiffs); Gibbs v. Ernst, 647 A.2d 882 (Pa. 1994) (naming adoptive parents and adopted child, a minor, as plaintiffs); Mallette, 661 A.2d at 68 (adoptive parents instituted action individually and as parents and next friends of adopted child); Price, 980 P.2d 302 (adoptive parents filed suit in their capacity as co-guardians ad litem of adopted child). However, none of the aforementioned cases discusses the issue of standing. Moreover, the fact that a party is named in a case's caption does not signify that the party possesses standing to bring the claims asserted in the case. See Hicks v. Teamsters Local 283, No. 95-1864, 1996 U.S. App. LEXIS 19083, at *4 (6th Cir. June 18, 1996) (after holding that party lacked standing, court amended case caption to remove the party's name). While one court held that an adopted child possessed a cognizable claim, it never addressed the issue of standing. See J.A. v. St. Joseph'sChildren's and Maternity Hosp., 52 Pa. D. C. 4th 142, 151 (C.P. Lackawanna County 2001).
Plaintiffs first argue that Lisa possesses standing to sue for her own wrongful adoption because she constitutes a "poor fit" for the Rowey family and, as a result, has developed attachment, identity, and self-esteem issues. Plaintiffs' "poor fit" theory does not prove that Lisa has suffered an injury in fact because an adopted child has no legally protected interest in the fit he or she has with her adoptive family. This Court could neither locate, nor have Plaintiffs offered any, law dealing with claims for "poor fit" or "temperament." Moreover, Lisa's alleged attachment, identity, and self-esteem issues constitute psychological injuries, which are here insufficient to confer standing.See Graham, 2001 U.S. Dist. LEXIS 7840, at *8 (stating that "[p]urely psychological harm suffered by a plaintiff is not sufficient to establish standing"); Ganulin, 71 F. Supp.2d at 830 (noting that "psychological harm is not sufficient injury in fact to confer standing"). Finally, as the Rhode Island Supreme Court declined to make adoption agencies "guarantors or insurers of a child's future health," see Mallette, 661 A.2d at 73, it would likely refuse to render them guarantors of a child's future personality fit with his or her adoptive family.
Plaintiffs further argue that because CFS, in a previous wrongful adoption suit, entered into a settlement agreement and filed in federal court for indemnification for an adopted child's claims, it is now estopped from challenging Lisa's standing in this suit. Plaintiffs, however, do not specify upon which type of estoppel they rely. Regardless, this Court finds that neither equitable nor judicial estoppel applies to the case at bar.
The party who asserts an estoppel claim bears the burden of proving its elements. Lichtenstein v. Parness, 81 R.I. 135, 138, 99 A.2d 3, 5 (1953). In order for equitable estoppel to apply, one must establish the following: (1) "an affirmative representation or equivalent conduct on the part of the person against whom the estoppel is claimed which is directed to another for the purpose of inducing the other to act or fail to act in reliance thereon" and (2) "that such representation or conduct in fact did induce the other to act or fail to act to his injury." ElMarocco Club, Inc. v. Richardson, 746 A.2d 1228, 1233 (R.I. 2000). Plaintiffs fail to meet their burden of establishing the elements of equitable estoppel. Plaintiffs have not established that Defendant entered into a settlement and filed in federal court for indemnification for the adopted child's claims in order to induce Plaintiffs to act or fail to act in reliance thereon. Moreover, Plaintiffs have also failed to prove that Defendant's conduct, by entering into a settlement and filing in federal court for indemnification for the adopted child's claims, induced Plaintiffs to act or fail to act to their injury.
The United States Supreme Court has articulated the rule of judicial estoppel as follows: "[w]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." New Hampshire v.Maine, 532 U.S. 742, 749, 121 S.Ct. 1808, 1814, 149 L.Ed.2d 968, 977 (2001). Judicial estoppel aims to "prevent improper use of judicial machinery," D H Therapy Assocs. v. Murray, 821 A.2d 691, 693 (R.I. 2003), and to "protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." 28 Am. Jur.2d. Estoppel § 74. In applying the doctrine of judicial estoppel, courts look to "whether the party seeking to assert an inconsistent position would derive an unfair advantage if not estopped."D H Therapy Assocs., 821 A.2d at 694. Courts also examine whether "the party who has taken an inconsistent position had succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." Id. (internal quotations omitted). Courts look to this factor because "[a]bsent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations and thus poses little threat to judicial integrity." NewHampshire, 532 U.S. at 750-51. Judicial estoppel does not apply when "the prior position was taken because of inadvertence, mistake, or is an innocent inconsistency." 28 Am. Jur.2d, Estoppel § 74. Moreover, courts in finding estoppel often require that the two positions be wholly inconsistent so that "the truth of one position must necessarily preclude the truth of the other position." Id.
Plaintiffs likewise fail to establish the elements of judicial estoppel. Defendant would not derive an unfair advantage if not estopped from challenging Lisa's standing because standing constitutes a threshold, jurisdictional requirement that must be met in each case. See
59 Am. Jur.2d Parties § 34 (stating that "[s]tanding is an aspect of subject matter jurisdiction"). See also Great Coastal Express, Inc. v.Blue Cross and Blue Shield of Va., 782 F. Supp. 302, 307 (E.D. Va. 1992) (noting that judicial estoppel is a judicially created doctrine and, as such, its application to a jurisdictional issue is inappropriate because "jurisdiction is a matter of legislative creation" and therefore, "cannot be circumvented by a judicially created doctrine"). Moreover, Defendant did not succeed in persuading a court to accept its earlier position; rather, it failed to even raise the issue of standing. Finally, Defendant's two positions are not inconsistent because although Defendant now takes the position that Lisa does not possess standing, Defendant did not assert in the prior case against it that the adopted child possessed standing; it simply failed to raise the issue.
As a third argument in support of Lisa's standing, Plaintiffs offer a life care plan prepared by a life care planner on Lisa's behalf. This Court finds that Plaintiffs have failed to sustain their burden in demonstrating that the life care plan establishes that Lisa has suffered or will imminently suffer injury in fact.
Fourth, Plaintiffs claim that Defendant caused Lisa to lose opportunity for proper diagnosis, treatment, and care. In support of this argument, Plaintiffs assert that after Defendant disclosed Lisa's complete biological family history, Dr. Hunt removed the provisional status from Lisa's bipolar diagnosis. Defendant, however, argues that Dr. Hunt never testified that he removed the provisional label from Lisa's diagnosis. Defendant further asserts that no evidentiary support exists that Lisa lost opportunity for proper diagnosis, treatment, and care because Plaintiffs have disclosed no expert opinion that Lisa's treatment would have been different or that her behavioral problems could have been avoided or ameliorated if the withheld information had been provided earlier, or that Lisa's diagnosis was delayed. Moreover, Defendant directs this Court's attention to Dr. Hunt's testimony that Lisa's ADHD and ODD diagnoses were based on behavior and not genetic history (Tr. of Dr. Hunt at 89); that Lisa's biological family information did not affect his diagnoses of ADHD and ODD (Tr. of Dr. Hunt at 89-90); and that after reviewing Lisa's mother's deposition, he did not change Lisa's diagnoses and does not recall changing her medications. (Tr. of Dr. Hunt at 315.)
This Court finds that Plaintiffs have failed to prove injury in fact to Lisa by their argument that Defendant caused Lisa to lose opportunity for proper diagnosis, treatment, and care. Defendant correctly indicates that Dr. Hunt did not testify that he removed the provisional status of Lisa's bipolar diagnosis after receiving Lisa's complete biological family history. Moreover, Dr. Hunt's above-cited testimony, coupled with Plaintiffs' neglect to provide any expert testimony proving Lisa's alleged lost opportunity for proper diagnosis, treatment, and care, demonstrates that Defendant's alleged failure to completely disclose Lisa's biological family history caused Lisa no injury in fact.
Finally, Plaintiffs argue that had Defendant not withheld Lisa's biological family history, the Roweys would not have adopted Lisa, and Lisa would have been placed with a family better-suited to meet her needs. As support for this argument, Plaintiffs rely on Dr. Hunt's testimony, in which, they allege, he states that the Roweys did not place Lisa in an approved residential facility because they had insufficient resources. Defendant, in turn, argues that this particular claim of Plaintiffs does not exist in the case law; Plaintiffs have provided no proof of such claim; and in fact, Plaintiffs have provided evidence to the contrary; that is, that the Roweys were aggressive in Lisa's treatment.
The lone case in which an adopted child asserts a claim similar to the one Plaintiffs now raise is St. Joseph's Children's and MaternityHospital. 52 Pa. D. C. 4th 142. In that case, the court held that an adopted child had a cognizable claim for his own negligent adoption where he alleged that the hospital's intentional misrepresentation concerning his medical history caused him to be placed with a couple who neither desired, nor were capable of caring for, a child with special needs. Id. at *151. The adoptive mother suffered from chronic hypertension, diabetes mellitus and exogenous obesity, all of which constitute chronic illnesses that would decrease her life span. Id. at *145.
While Plaintiffs' claim may exist in case law, this Court finds that Plaintiffs do not allege an injury in fact, but rather an invasion of a legally protected interest that is conjectural or hypothetical. In contrast to St. Joseph's Children's and Maternity Hospital, where objective evidence existed in the form of the mother's sickness that the parents were ill-equipped to care for a special needs child, here no evidence exists that the Roweys were unable to care for Lisa. Rather, as Defendant correctly indicates, the Roweys were aggressive in Lisa's care. (See Tr. of Dr. Hunt at 166-67.) Moreover, Dr. Hunt's testimony upon which Plaintiffs rely for the contention that the Roweys did not place Lisa in an approved residential facility due to insufficient resources actually states: "[t]hey looked into a few specialized schools and I believe one was more expensive than they could manage." (Tr. of Dr. Hunt at 172) (emphasis added.) Dr. Hunt's belief that one school was too expensive for the Roweys fails to prove that Lisa was harmed by not being placed with another family. Finally, as of the date of the deposition, Dr. Hunt had not recommended that Lisa be placed in a long-term treatment facility. (Tr. of Dr. Hunt at 173.) This Court finds, therefore, that Plaintiffs have failed to prove that Lisa possesses standing on the grounds that another family could have better provided for her.
In sum, Plaintiffs have failed to prove that Lisa has suffered or will imminently suffer injury in fact. Moreover, this Court finds that this case presents no question of substantial public interest for which the Court could excuse the standing requirement. Whether Lisa possesses standing in this suit affects Plaintiffs and not the public at large.Cf. Burns, 617 A.2d at 115-16 (no matter of substantial public interest). Consequently, this Court grants Defendant's motion and denies Plaintiffs' motion as to Lisa's standing, and dismisses Lisa's claims for lack of standing to bring same.
III. Negligence, Negligent Misrepresentation, Intentional Misrepresentation, and Breach of Fiduciary Duty Claims
Defendant moves this Court to grant summary judgment as to all of Plaintiffs' claims on the grounds that Plaintiffs cannot prove causation.[7] More specifically, Defendant asserts that Plaintiffs cannot prove that Lisa's medical conditions are causally related to Defendant's alleged misrepresentations; that Lisa's conditions were reasonably predictable at the time of the adoption; or that the Roweys would not have adopted Lisa but for Defendant's alleged misrepresentations.
Plaintiffs, on the other hand, argue that this Court should deny Defendant's motion because proof exists that Lisa's medical conditions are casually related to Defendant's alleged misrepresentations, and questions of material fact exist as to whether Lisa's conditions were reasonably predictable at the time of the adoption and concerning the Roweys' statements about Lisa's adoption.
While causation presents a question of fact usually reserved for the jury, summary judgment is appropriate where plaintiffs will be unable to prove causation at trial. Redfern v. Howard, No. 99-5759C, 2002 Mass. Super. LEXIS 151 (Mass. Super. Ct. Mar. 20, 2002). "Proximate cause consists of two elements: cause in fact and legal causation." Morris v.Washington, No. 47964-4-I, 2003 Wash. App. LEXIS 127, at *20 (Wash. Ct. App. Feb. 3, 2003). Cause in fact constitutes "the `but-for' cause of the injury; that is, but for the defendant's actions the plaintiff would not have been injured." Id. Legal causation focuses on "whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability." Id.
To establish but-for causation, or cause in fact, in the context of a wrongful adoption and negligence suit, the claimants must "prove that they would not have adopted . . . [the child] had . . . [the adoption agency] disclosed the information it was required by law to disclose."Id. at *20-21. See also Roe v. Jewish Children's Bureau of Chicago,790 N.E.2d 882, 895 (Ill.App. Ct. 2003) (stating that "to establish the causation element in a fraudulent misrepresentation or negligent misrepresentation cause of action an adoptive parent must establish that he asked a question that a rational parent would consider relevant to gauging the future risks of serious mental . . . [or] physical illness, and that but for the adoption agency's false statement regarding that risk they would not have adopted the child"); Mallette, 661 A.2d at 71 (stating the causation element for a negligent misrepresentation claim when it noted that, "the . . . [adoptive parents] alleged that they would not have adopted . . . [the child] if they had known of his medical and genetic background and that their injuries resulted from justifiable reliance on . . . [the agency's] misrepresentations"); Jackson, 956 P.2d at 53 (stating that in order to prove causation in a wrongful adoption suit based on negligent misrepresentation, the claimant must prove that (1) the defendant's conduct, in withholding or misrepresenting information concerning the adopted child's background, led to the plaintiff's decision to adopt the child and, therefore, helped produce the plaintiff's injuries and (2) but for the fact that defendant withheld or misrepresented certain background information, plaintiffs would not have adopted the child, would not have been injured, and would not have incurred the damages they now assert).
This Court finds that an issue of material fact exists as to whether the Roweys would have adopted Lisa had CFS disclosed the information that it allegedly withheld. The Roweys swear in their affidavits that "[b]ut for the verbal representations of Children's Friend and Service, prior to and at the time of, the adoption I would not have adopted the child that Children's Friend and Service offered us for placement on December 7, 1982" (L. Rowey Aff. ¶ 27; J. Rowey Aff. ¶ 26) and that "[b]ut for the misrepresentations of Children's Friend and Service, relative to the medical and genetic background of prospective adoptive child offered to us . . . and my reliance upon those misrepresentations, and said adoption agencies [sic] inducement to proceed, I would not have adopted said child or suffered any injuries." (L. Rowey Aff. ¶ 35; J. Rowey Aff. ¶ 34.) L. Rowey, however, testified first that if she had known that Lisa's mother used marijuana some time prior to the pregnancy, she probably would not have adopted Lisa. (Tr. of L. Rowey at 46.) L. Rowey then testified that she would have proceeded with the adoption had she discovered after Lisa's placement, but before the adoption's finalization, that Lisa's mother used marijuana. (Tr. of L. Rowey at 68.) She further testified that she probably would have proceeded with the adoption had she discovered before the adoption's finalization that Lisa's mother smoked during her pregnancy. (Tr. of L. Rowey at 68-69.) J. Rowey testified that he could not answer whether he would have adopted Lisa if he discovered after having taken placement of Lisa, but before the adoption's finalization, that Lisa's mother had received no prenatal care. (Tr. of J. Rowey at 62). However, he did testify that if they knew before placement that Lisa's mother had received no prenatal care, the Roweys would not have finalized the adoption. (Tr. of J. Rowey at 60-62.)
Furthermore, this Court finds that Plaintiffs need not prove, as Defendant argues, that Lisa's conditions are causally related to Defendant's alleged misrepresentations or that Lisa's conditions were reasonably predictable at the time of the adoption. To prove causation in a wrongful adoption suit, one need not "demonstrate, by way of expert testimony, that the emotional and psychological condition of . . . [the adopted child's] birth mother and . . . father caused his present condition." Jackson, 956 P.2d at 51. Rather, "in those cases which do not involve issues of intervening cause, proof of causation is satisfied by proof that a party's conduct was a cause-in-fact of the damage alleged."Id. See also Morris, 2003 Wash. App. LEXIS 127, at *22-23 (holding that a jury instruction requiring the plaintiff to establish that the information withheld by the adoption agency "must have been reasonably related to a proximate cause of . . . [the adopted child's] condition" was appropriate where the evidence supported a finding that causes other than those contained in the information the adoption agency negligently failed to disclose was a proximate cause of the adopted child's problems). Furthermore, the foreseeability inquiry of whether, in light of the information the agency possessed regarding the health of the adopted child's parents, the agency could have foreseen that the adopted child would have developed his current problems pertains to the question of duty and not causation. Jackson, 956 P.2d 35, at *52. Therefore, Plaintiffs need not establish, for the purposes of proving causation, that Lisa's conditions were foreseeable from the information possessed by Defendant and, as this Court has been presented with no evidence of intervening causes, Plaintiffs need not establish that the information allegedly withheld by Defendant was reasonably related to a proximate cause of Lisa's condition. Thus, this Court denies Defendant's motion as to Plaintiffs' negligence, negligent misrepresentation, intentional misrepresentation, and breach of fiduciary duty claims.
IV. Emotional Distress Claims
Defendant moves this Court to dismiss Plaintiffs' claims for intentional infliction of emotional distress and negligent infliction of emotional distress on the grounds that Plaintiffs can provide no expert testimony establishing a causal relationship between their emotional distress and Defendant's alleged misrepresentations. Defendant further argues that Plaintiffs' own testimony fails to prove that Defendant's alleged misrepresentations caused their symptoms. Plaintiffs, however, argue that this Court should deny Defendant's Motion for Summary Judgment as to their emotional distress claims because J. Rowey, L. Rowey, and Meghan have testified to physical symptomatology, which they claim results from emotional distress caused by Defendant.
It is well-settled that "a plaintiff seeking to recover a monetary award for the tortious infliction of emotional distress must establish . . . that he or she experienced physical symptoms of their alleged emotional distress." Adams v. Uno Restaurants, 794 A.2d 489, 492 (R.I. 2002). Moreover, the claimant must provide expert medical testimony "to support the existence of a causal relationship between the defendant's wrongful conduct and . . . [plaintiff's] emotional distress." Id.
Therefore, when a plaintiff suing for intentional infliction of emotional distress merely testified at trial that she experienced certain symptoms, which she attributed to the defendant's conduct, the court held that,
 "although . . . [the plaintiff] was competent to testify that she suffered psychic problems and allegedly experienced physical symptomatology therefrom, she was, however, as was her social worker, not qualified to testify that those specifically alleged psychic and physical ills were proximately caused by . . . [the defendant's] actions. The origin and causal connection of those psychic and physical complaints to her . . . [interaction with the defendant] required expert medical opinion" Vallinoto v. DiSandro, 688 A.2d 830, 838 (R.I. 1997).
The expert testimony requirement aims to protect against "bogus or exaggerated emotional-damage claims." Hawkins v. Scituate Oil Co., Inc.,723 A.2d 771, 773 (R.I. 1999).
In limited circumstances, a court will excuse the expert testimony requirement. In Adams, for example, the court bypassed the expert testimony requirement because plaintiff's complaint to the police, arrest, criminal charge for disorderly conduct, arraignment, revocation of his military security clearance, and disqualification from an overseas mission provided "objective and uncontradicted evidence," from which "an ordinary lay person or trial juror would be capable of determining without the aid of expert medical testimony whether emotional distress and humiliation could ordinarily and naturally follow from such events."Adams, 794 A.2d at 493. The court distinguished the plaintiff's case from "the usual case where a claim for emotional distress and humiliation is oftentimes made without objective facts to substantiate such a claim."Id.
This Court grants Defendant's Motion for Summary Judgment as to Plaintiffs' emotional distress claims. Plaintiffs provided no evidence to refute Defendant's claim that they have produced no names of expert witnesses prepared to testify regarding their emotional distress claims; rather, Plaintiffs direct this Court's attention to testimony in which they state that they suffer from certain symptoms and ailments, which they attribute to stress brought on by Lisa. (Plaintiffs' Memorandum ofLaw in Support of Their Motion for Partial Summary Judgment and TheirObjection to Defendant's Motion for Summary Judgment at 74-75.) This Court finds that Plaintiffs are unqualified to testify as to the causation of their physical symptomatology, see Vallinoto, 688 A.2d at 838, and "objective and uncontradicted evidence" from which an ordinary lay person or juror could determine, without the aid of expert testimony, whether emotional distress could naturally result from Defendant's conduct does not exist. See Adams, 794 A.2d at 493.
Additionally, Plaintiffs assert that they may prove such symptomatology at trial by the submission of medical affidavits. Even if this Court were to allow Plaintiffs to provide such evidence at trial, Plaintiffs have failed to meet their affirmative duty, for the purposes of summaryjudgment, of setting forth specific facts showing that a genuine issue of material fact exists. Accordingly, Defendant's motion is granted as to Plaintiffs' emotional distress claims.
V. Future Care Costs
In its Motion for Summary Judgment, Defendant moves this Court to find that L. and J. Rowey cannot claim costs for Lisa's future care. This Court, however, needs not address this issue as its ruling that L. and J. Rowey's claims are time barred renders the issue moot.[8]
VI. Breach of Contract Claim
Plaintiffs allege that the Roweys and CFS entered into a contract, arguing that the Roweys' application constituted an offer, Defendant's letter informing the Roweys that their application had been approved constituted an acceptance, and the $75 application fee constituted consideration. Plaintiffs further assert that Defendant breached this contract by placing the Roweys with a special needs child when the Roweys indicated in their application that they would not consider such a child. Defendant, however, moves this Court to grant summary judgment as to Plaintiffs' breach of contract claim, asserting that adoption contracts are void as against public policy, and that even if this Court were to recognize a breach of contract claim in the adoption context, Defendant never assumed any contractual obligations to Plaintiffs.
The Rhode Island Supreme Court has yet to rule on the viability of a breach of contract claim in the context of a wrongful adoption suit. However, some other jurisdictions have refused to entertain such claims. For example, the Ohio Court of Appeals refused to recognize such a claim, stating that "a bargained-for exchange with respect to the life of a child is repugnant." Allen v. Children's Service, 567 N.E.2d 1346, 1349 (Ohio Ct. App. 1990). In reaching this decision, the court looked to Burrv. Stark County Bd. of Commrs. in which the Ohio Supreme Court stated that "[i]n no way do we imply that adoption agencies are guarantors of their placements" as "[s]uch a view would be tantamount to imposing an untenable contract of insurance that each child adopted would mature to be healthy and happy." 491 N.E.2d 1101, 1109 (Ohio 1986). See also Moorev. Dep't of Human Resources, 469 S.E.2d 511, 512 (Ga. Ct. App. 1996) (noting that "given the conflicting emotions involved in many adoptions and the role of the courts in any adoption process, a promise to provide a child for adoption without legal entanglements would be unreasonable to make and impossible to keep"); Wolford, 17 F. Supp.2d at 584 (rejecting breach of contract claim in wrongful adoption suit). Nevertheless, other courts have allowed a breach of contract action in the wrongful adoption context. See Cesnik v. Edgewood Baptist Church, 88 F.3d 902, 909 (11th Cir. 1996) (recognizing breach of contract claim in wrongful adoption suit and analogizing situation to "a seller misrepresenting the quality of goods being sold to a buyer").
This Court finds persuasive the line of cases refusing to recognize a breach of contract claim in the wrongful adoption context, especially given the Rhode Island Supreme Court's admonition in Mallette that "our opinion in no way renders adoption agencies guarantors or insurers of a child's future health," 661 A.2d at 73. Furthermore, even if this Court were to recognize such a claim, which it here declines to do, it finds that Plaintiffs' application and Defendant's letter contain no language obligating Defendant to perform. The application merely states the Roweys' background information and their preferences for a child. Defendant's letter, in turn, informed the Roweys that their application was complete and had been approved, and that they would be contacted when a child became available. Accordingly, this Court grants Defendant's Motion for Summary Judgment as to Plaintiffs' breach of contract claim.
 CONCLUSION
With the exception of Plaintiffs' claims as to the statute of limitations and Lisa's standing, this Court finds Plaintiffs' Motion for Partial Summary Judgment procedurally improper. It thus declines to consider the remaining issues raised by Plaintiffs' motion. This Court grants Defendant's Motion to Strike the Affidavits of Joseph L. Rowey and Linda E. Rowey to the extent specified above. Moreover, the Court grants Defendant's Motion for Summary Judgment and denies Plaintiffs' Motion for Partial Summary Judgment as to J. and L. Rowey's claims because they are time barred, but denies Defendant's motion and grants Plaintiffs' motion as to Lisa and Meghan's claims because they were tolled by R.I. Gen. Laws § 9-1-19. The Court dismisses Lisa's claims as she lacks standing to assert them. Finally, Defendant's Motion for Summary Judgment is granted as to Plaintiffs' breach of contract and emotional distress claims and denied as to Plaintiffs' negligence, negligent misrepresentation, intentional misrepresentation, and breach of fiduciary duty claims. Counsel shall submit an appropriate order and judgment for entry.
[1] Also named as defendants are Camille Hardiman, John Doe Nos. 1-20, and Jane Doe Nos. 1-20; however, Camille Hardiman is deceased, and Plaintiffs have not identified or served any of the Does.
[2] Joseph L. and Linda E. Rowey bring this action individually and as parents and next friends of Lisa A. Rowey and Meghan E. Rowey.
[3] Plaintiffs fail, in their Motion for Partial Summary Judgment, to specify on which Superior Court Rule of Civil Procedure they rely.
[4] Compare Darnell v. Target Stores, 16 F.3d 174, 177 (7th Cir. 1994) (stating that "parties cannot thwart the purpose of Rule 56 by creating issues of fact through affidavits that contradict their own depositions" and "self-serving affidavits without factual support in the record will not defeat a motion for summary judgment") with Perma Research and Dev.Co. v. Singer Co., 410 F.2d 572, 578 (2d Cir. 1969) (stating rule that "if a witness has made an affidavit and his deposition has also been taken, and the two in some way conflict, the court may not exclude the affidavit from consideration in the determination of the question whether there is any genuine issue as to any material fact").
[5] Paragraph 33 of L. Rowey's affidavit contains essentially the same statement.
[6] October 29, 2006 is three years after the impediment of Lisa's minority has been removed; that is, it is three years after Lisa attains twenty-one years of age.
[7] This Court declines to reach the issue of causation with respect to Plaintiffs' breach of contract and emotional distress claims as the Court deals with said claims separately.
[8] Similarly, this Court need not rule on Plaintiffs Motion for Partial Summary Judgment as to this issue because it found the motion procedurally improper with the exception of Plaintiffs' claims as to the statute of limitations and Lisa's standing.